# UNITED STATES COURT OF APPEALS
## Tenth Circuit
## Byron White United States Courthouse
## 1823 Stout Street
## Denver, Colorado 80294
## (303) 844-3157

Patrick J.  Fisher, Jr.                                     Elisabeth A. Shumaker
Clerk                                                      Chief Deputy Clerk

August 27, 1999


**TO:**   ALL RECIPIENTS OF THE OPINION

**RE:**   98-7057, *USA v. Roberts*
          Filed on August 3, 1999


The opinion filed on August 3, 1999, contains several mistaken citations.

The opinion cited "18 U.S.C. § 1151" and "18 U.S.C. § 1153" as "25 U.S.C § 1151" and "25 U.S.C. § 1153" at pages 8, 11, 12, and 13 of the original version.

A corrected copy of the opinion is attached for your convenience with the proper citations.


                              Very truly yours,
                              Patrick Fisher, Clerk


                              Trish Lane
                              Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 3 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

v.

HOLLIS EARL ROBERTS,

       Defendant-Appellant.

No. 98-7057

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 95-CR-35-S)**

---

Susan G. James, Susan G. James & Associates, Montgomery, Alabama, for Defendant-Appellant.

Sheldon J. Sperling (Bruce Green, United States Attorney, and Linda A. Epperley, Assistant United States Attorney, with him on the briefs), First Assistant United States Attorney, Muskogee, Oklahoma, for Plaintiff-Appellee.

---

Before **PORFILIO**, **MCWILLIAMS**, and **BALDOCK**, Circuit Judges.

---

**PORFILIO**, Circuit Judge.

---

On June 9, 1995, Hollis Earl Roberts was charged in the United States District Court for the Eastern District of Oklahoma with two counts of aggravated sexual abuse in violation of 18 U.S.C. § 2241; one count of sexual abuse, in violation of 18 U.S.C. § 2242, and five counts of abusive sexual contact, in violation of 18 U.S.C. § 2244. At all relevant times, Mr. Roberts was Principal Chief of the Choctaw Nation of Oklahoma, as well as a member of the tribe, and the three victims were employees and members of the Choctaw Nation. A jury trial began on June 2, 1997, and four days later, the jury found Mr. Roberts guilty on three counts. The district court ordered Mr. Roberts detained pending sentencing, and later sentenced him to three concurrent prison terms. Mr. Roberts' motion in the district court challenging jurisdiction under 28 U.S.C. § 2255, as well as his motion with this court seeking to stay this appeal, have been denied. On appeal, Mr. Roberts argues the district court lacked subject matter jurisdiction because the alleged offenses did not occur in Indian Country; the government failed to prove an essential element of the offense, namely, that the offense occurred in Indian Country; the district court improperly admitted testimonial evidence; the prosecutor engaged in improper conduct; and the district court improperly applied the sentencing guidelines. Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we affirm all aspects of the conviction and sentence.

2

## I.

Mr. Roberts served as Principal Chief of the Choctaw Nation of Oklahoma for 19 years, holding "the supreme executive power of this Nation." <u>Constitution of the Choctaw Nation of Oklahoma</u>, art. VI, § 1. The Constitution further provides the Chief "shall fix and prescribe salaries and allowances for all elected or appointed officials and employees of the Choctaw Nation except the members of the Tribal Council and the Tribal Court," *id.* at art. VII, § 3, and "shall have the power to remove any official appointed by him except for members of the Tribal Court and the Tribal Council." ***Id.*** at art. VII, § 8. Trial testimony established the Choctaw Nation payroll was $22 million per annum; the total annual income of the tribe was $125 million; and the Chief's salary was $120,000 plus benefits in 1995.

At trial, more than ten women, all members and employees of the Choctaw Nation, described how, during his tenure as Principal Chief, Mr. Roberts forced unwanted sexual acts on them, usually in his office at the Tribal Complex. Angella Jean Gilbert, Misty Grammar, and Kobi Dawn Russ testified to specific acts of abusive sexual contact and aggravated sexual assault, and the other women testified to extrinsic acts. The defense presented seven witnesses, all tribal employees, to support the defendant's theories the women had engaged in

3

consensual sex with Mr. Roberts or their allegations were part of a political ploy to unseat him as Principal Chief. The jury returned guilty verdicts on Count I, abusive sexual contact against Angella Jean Gilbert, in violation of 18 U.S.C. § 2244; Count II, aggravated sexual abuse against Angella Jean Gilbert, in violation of 18 U.S.C. § 2241(a)(1); and Count VI, abusive sexual contact against Kobi Dawn Russ, in violation of 18 U.S.C. § 2244; and not guilty verdicts on the other four counts.

## II.

The charged conduct occurred at the Choctaw Nation Tribal Complex, a property which is owned by the United States in trust for the Choctaw Nation. The Major Crimes Act, 18 U.S.C. § 1153, confers on the United States exclusive jurisdiction over certain offenses, including those alleged against Mr. Roberts, committed in Indian Country, and the district court accordingly premised jurisdiction in this case on its finding the alleged criminal acts occurred within Indian Country. Although his counsel acknowledged at oral argument the United States owns the Tribal Complex property, Mr. Roberts contends trust status does not suffice to establish Indian Country; certain irregularities invalidated the process by which the Department of the Interior attempted to take the land into trust; and the Secretary of the Interior (Secretary) lacks authority to take this, or

4

any land, into trust for an Indian tribe. The district court found these arguments unpersuasive, as do we.

We review *de novo* Mr. Roberts' several challenges to the district court's exercise of jurisdiction, *see United States v. Brown*, 164 F.3d 518, 521 (10th Cir. 1998), and first consider his most fervent argument that the property's trust status does not establish Indian Country. With exceptions not relevant to this case, 18 U.S.C. § 1151 defines Indian Country as:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

Mr. Roberts argues here, as he did below, the Tribal Complex satisfies none of the three categorical definitions of Indian Country. Following Mr. Roberts' motion to dismiss for lack of subject matter jurisdiction, the district court held a hearing. The government presented the testimony of Tom Williams, Director of Real Estate Services for the Choctaw Nation; Glendel Rushing, Bryan County Assessor; and Mary Downing, Realty Specialist for the Bureau of Indian Affairs (BIA). Mr. Roberts presented the testimony of Dennis Springwater, Acting

5

Deputy Area Director for the BIA. Based on their testimony, the district court derived the facts summarized here.

The Choctaw Nation Tribal Complex serves as headquarters of the Nation, and between sixty and seventy employees work there. In addition to the various administrative functions conducted at the headquarters, the Choctaw Nation operates bingo games on the Tribal Complex property. The building is located in Durant, Oklahoma, and formerly housed the Oklahoma Presbyterian College for girls. In 1976, the property was deeded to the United States of America in trust for the Choctaw Nation of Oklahoma so long as the premises are used for the purposes of the Choctaw Nation. *See United States v. Roberts*, 904 F. Supp. 1262, 1264-65 (E.D. Okla. 1995) (conducting an extensive review of the chain of title). The Red River Valley Historical Association operates its headquarters and museum in buildings located at the Tribal Complex pursuant to a lease with the Choctaw Nation. Since 1976, both the BIA and Choctaw Nation have treated the property as trust land, as has the State of Oklahoma which considers it beyond the state's taxation jurisdiction and does not list it on the state ad valorem tax rolls. *See id.* Based on the evidence and the Indian Country case law, the district court held this trust land, even though not a formally declared reservation, was Indian Country. *See id.* at 1265-68. We believe the court's conclusion was well-founded in precedent.

The United States' acquisition of the Tribal Complex property in trust for the Choctaw Nation occurred pursuant to the Indian Reorganization Act (IRA) which provides, in part:

> The Secretary of the Interior is hereby authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments . . . for the purpose of providing land for Indians.
> . . . .
> Title to any lands or rights acquired pursuant to sections . . . 465 [and others] shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

25 U.S.C. § 465. The Supreme Court has had several occasions to comment on the jurisdictional status of tribal trust land. In *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 511, 111 S. Ct. 905, 910 (1991), the Supreme Court held the tribe's sovereign immunity from state taxes applied to cigarette sales on tribal trust land, even though that land did not constitute a "formally designated 'reservation.'" The Court explained:

> The State contends that the Potawatomis' cigarette sales do not, in fact, occur on a "reservation." . . . [No] precedent of this Court has ever drawn the distinction between tribal trust land and reservations that Oklahoma urges. . . . We [have] stated that the test for determining whether land is Indian country does not turn upon whether that land is denominated "trust land" or "reservation."

7

> Rather, we ask whether the area has been " 'validly set apart for the use of the Indians as such, under the superintendence of the Government.'"

*Id.* (citing *United States v. John*, 437 U.S. 634, 650, 98 S. Ct. 2451 (1978) (Major Crimes Act provides a proper basis for federal prosecution of a crime occurring on lands held in trust by the federal government for the benefit of the Mississippi Choctaw Indians))[1]; *see also Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 453 n.2, 115 S. Ct. 2214 (1995) (Oklahoma may not apply its motor fuels tax to fuel sold by the tribe in Indian Country and "'Indian country' as Congress comprehends that term, *see* 18 U.S.C. § 1151, includes formal reservations and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States."); *Oklahoma Tax Comm'n v. Sac and Fox Nation*, 508 U.S. 114, 123, 113 S. Ct. 1985 (1993) ("Our cases make clear that a tribal member need not live on a formal reservation to be outside the State's taxing jurisdiction; it is enough that the member live in Indian Country. Congress has defined Indian country broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States.").

---

[1] In *United States v. John*, 437 U.S. 634, 649, 98 S. Ct. 2451 (1978), the land in question had been proclaimed a reservation at the time of suit rendering this discussion of the status of land held in trust dicta.

Applying these Supreme Court cases, we believe official "reservation" status is not dispositive and lands owned by the federal government in trust for Indian tribes are Indian Country pursuant to 18 U.S.C. § 1151. *See Cheyenne-Arapaho Tribes v. State of Oklahoma*, 618 F.2d 665, 668 (10th Cir. 1980) (state hunting and fishing laws do not apply on trust lands located within a disestablished reservation because "lands held in trust by the United States for the Tribes are Indian Country within the meaning of § 1151(a)")[2]; *Langley v. Ryder*, 778 F.2d 1092, 1095 (5th Cir. 1985) (affirming the district court's exercise of federal criminal jurisdiction because "whether lands are merely held in trust for the Indians or whether the lands have been officially proclaimed a reservation, the lands are clearly Indian country"); *United States v. Azure*, 801 F.2d 336, 339 (8th Cir. 1986) ("Indian trust land, although not within the boundaries of the Turtle Mountain Reservation, can be classified as a de facto reservation, at least for purposes of federal criminal jurisdiction.");[3] *see also Santa Rosa Band of*

---

[2] In *Cheyenne-Arapaho Tribes v. State of Oklahoma*, 618 F.2d 665, 668 (10th Cir. 1980), we observed, "the Solicitor for the Interior Department ruled that land acquired for the Cheyenne-Arapaho Tribes under the Oklahoma Indian Welfare Act had reservation status," but we did not state the Solicitor's ruling was necessary to our holding the trust lands were Indian Country.

[3] The Eighth Circuit also observed, "[i]t is well established that the actions of the federal government in its treatment of Indian land can create a de facto reservation, even though the reservation was not created by a specific treaty, statute, or executive order." *United States v. Azure*, 801 F.2d 336, 338 (8th Cir. 1986). The Eighth Circuit has not always followed *Azure*, although it recognizes

(continued...)

9

*Indians v. Kings County*, 532 F.2d 655, 666 (9th Cir. 1975) ("We are confident that when Congress in 1934 authorized the Secretary to purchase and hold title to lands for the purpose of providing lands for Indians, it understood and intended such lands to be held in the legal manner and condition in which trust lands were held under the applicable court decisions free of state regulation.").

In *Buzzard v. Oklahoma Tax Comm'n*, 992 F.2d 1073, 1076-77 (10th Cir. 1993) (affirming the district court's decision land the United Keetoowah Band purchased and owned in fee simple with a restriction against alienation was not Indian Country), referenced by both the government and Mr. Roberts, we discussed how trust status can demonstrate both federal set aside and superintendence. Relying on the holding in *United States v. McGowan*, 302 U.S. 535, 539, 58 S. Ct. 286 (1938), that Reno Indian Colony had been set aside by the government for the use of Indians because it was purchased by the United States for the purpose of providing lands for needy Indians, we explained:

> Similarly, trust land is set apart for the use of Indians by the federal government because it can be obtained only by filing a request with the Secretary of the Interior, 25 C.F.R. § 151.9 (1992), who must consider, among other things, the Indian's need for the land, *id.* § 151.10(b), and the purposes for which the land will be used, *id.* §

---

[3](...continued)
the precedent. *See United States v. Stands*, 105 F.3d 1565, 1575 & n.3 (8th Cir. 1997) ("For jurisdictional purposes, tribal trust land beyond the boundaries of a reservation is ordinarily not Indian country. . . . In some instances, off-reservation tribal trust land may be considered Indian country (citing *Azure*).").

10

151.10(c). If the request is approved, the United States holds the land as trustee. *Id.* § 151.2(d). Thus, land is "validly set apart for the use of Indians as such" only if the federal government takes some action indicating that the land is designated for use by Indians.

*Buzzard*, 992 F.2d at 1076. We believed trust status could also meet *McGowan's* superintendency requirement:

> Superintendency over the land requires the active involvement of the federal government. This involvement was shown in *McGowan* by the federal government's retention of title to the land and its regulation of activities in the Colony. 302 U.S. at 538-39, 58 S. Ct. at 287-88. The United States also holds title to trust land, although only as trustee. In addition, before agreeing to acquire trust land, the Secretary must consider several factors including the authority for the transactions, *id.* § 151.10(a), the impact on the state resulting from the removal of the land from the tax rolls, *id.* § 151.10(3), and jurisdictional problems that might arise, *id.* § 151.10(f). These requirements show that, when the federal government agrees to hold land in trust, it is prepared to exert jurisdiction over the land.

*Id.*

Notwithstanding these Supreme Court and Tenth Circuit precedents, Mr. Roberts cites *State of Alaska v. Native Village of Venetie*, 522 U.S. 520, 118 S. Ct. 948 (1998), in support of his position trust lands are not Indian Country. In *Venetie*, the Court had to decide whether former reservation lands, conveyed to a Native corporation and then to the Native Village of Venetie in communal fee simple pursuant to the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1601, could be considered Indian Country under 18 U.S.C. § 1151, thereby permitting the tribe to tax non-Indians doing business on the lands. *See id.* at

11

951-52. Because the lands were neither a reservation nor allotment, the question was whether they constituted a dependent Indian community. *See id.* at 953. The Court announced for the first time a two-part test for dependent Indian community, stating, "[we] must . . . conclude that in enacting § 1151(b), Congress indicated that a federal set-aside and a federal superintendence requirement must be satisfied for a finding of a 'dependent Indian community.'" *Id.* at 954. According to the Court, the language of the ANCSA clearly showed Congress had no intention to set aside or superintend the lands at issue; therefore, Venetie was not a dependent Indian community. *See id.* at 955-56.

We must first observe the factual differences distinguishing *Venetie* from the present case. Whereas the Choctaw Tribal Complex is owned by the federal government in trust for the Choctaw Nation pursuant to the IRA, the disputed land in *Venetie* was owned in communal fee simple by an Indian tribe pursuant to the ANCSA. In *Venetie*, there was no possibility the lands could qualify as a reservation under 18 U.S.C. § 1151(a) because the ANCSA had explicitly abrogated its reservation status, *see id.* at 953, whereas here the IRA authorizes the Secretary to acquire lands in trust for tribes, and contemplates the Secretary may officially declare them to be reservations. *See* 25 U.S.C. § 467.[4]

---

[4] As discussed above, however, official declaration of reservation status is not necessary for the property to be treated as Indian Country under 18 U.S.C.

(continued...)

12

Further, we find in *Venetie* neither a declaration that tribal trust lands are not Indian Country for purposes of criminal jurisdiction, nor a repudiation of the Court's prior discussions of "informal" reservations. The test Justice Thomas announced for 18 U.S.C. § 1151(b) Indian Country (dependent Indian community) in *Venetie* does correspond with the factors Chief Justice Rehnquist articulated in *Potawatomi* as establishing Indian Country under 18 U.S.C. § 1151(a) (reservation) when there is no formal reservation. In both instances, the Court looked for federal set aside and superintendence. *See Venetie*, 118 S. Ct . at 953;[5] *Potawatomi*, 498 U.S. at 511. Thus, the relationship between informal reservations and dependent Indian communities is not entirely clear under current case law. But based on Justice Thomas' holding, "[dependent Indian community] refers to a limited category of Indian lands that are neither reservations nor allotments," *Venetie*, 118 S. Ct. at 953, and the Court's earlier pronouncements

---

[4](...continued)
§ 1151. Rather, as the Supreme Court has said, it is enough that the property has been validly set apart for the use of the Indians, under federal superintendence. *See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 111 S. Ct. 905 (1991).

[5] Although the facts supporting "set-aside" and "superintendence" appear to be case sensitive, Justice Thomas further explained, "the federal set-aside requirement ensures that the land in question is occupied by an 'Indian community'; the federal superintendence requirement guarantees that the Indian community is sufficiently 'dependent' on the Federal Government that the Federal Government and the Indians involved, rather than the States, are to exercise primary jurisdiction over the land in question." *See State of Alaska v. Native Village of Venetie*, 522 U.S. 520, 118 S. Ct. 948, 955 (1998).

such as, "Congress has defined Indian country broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States," *Sac & Fox*, 508 U.S. at 123, we believe both dependent Indian communities and reservations, whether formal or informal, continue to exist under 18 U.S.C. § 1151 and Supreme Court jurisprudence.

We need not further expound on the Supreme Court's cases in this area because, no matter which categorical label we choose to affix, the property in this case, owned by the United States in trust for the Choctaw Nation, is Indian Country, particularly in light of the district court's findings the Tribal Complex property was validly set-aside for the tribe under the superintendence of the federal government. We will now turn to these findings as we address Mr. Robert's contentions the trust process was improperly executed and the Secretary lacks authority to take lands into trust for tribes.

As the district court noted, when trust land is acquired, the federal government must take "some action indicating that the land is designated for use by Indians." *Roberts*, 904 F. Supp. at 1266 (citing *Buzzard*, 992 F.2d at 1076). In *Buzzard*, we outlined the procedure the Secretary uses to acquire land in trust. Although the regulations discussed in *Buzzard* were not in effect in 1976 when the federal government acquired the Tribal Complex property in trust for the

14

Choctaw Nation, the testimony of Mary Downing, Realty Specialist for the BIA[6]

revealed that in 1976 the BIA followed substantially the same procedures as those

currently codified at 25 C.F.R. §§ 151.1-151.14. ***See Roberts***, 904 F. Supp. at

1268. Claiming the government failed to follow even the informal procedures

when the Tribal Complex property was purchased in trust in 1976, Mr. Roberts

points to various deficiencies -- for example, the transaction was approved after

the deed had been executed and filed of record, the approved warranty deed was

never filed and returned to the BIA, and the transaction was completed before the

BIA ordered a title opinion.

The district court, however, engaged in a detailed review of the process by

which the land was taken into trust, and found:

> On August 8, 1976, the Superintendent for the Talihina office of the
> BIA received a request from the Chief of the Choctaw Nation to
> accept the tribal complex property in trust. Enclosed with this
> request were a current abstract, a title opinion from a private
> attorney, a contract for sale and proposed lease, the Choctaw Nation's
> statement of the reasons for the acquisition, and other documents
> related to the transaction. These documents, as well as a title opinion
> from the field solicitor, were forwarded to the Area Director, who
> approved the purchase of the tribal complex property in trust for the
> Choctaw Nation on August 25, 1976.

---

[6] Springwater testified that in 1976 there were no procedures for taking
land in trust. He stated the Area Director had "pretty broad discretionary
authority."

*Id.* The court also agreed with the government, "it is doubtful that informal policies or procedures confer substantive rights which may be enforced by defendants in criminal actions." *Id.* at 1268 n.8 (citing *United States v. Thompson*, 579 F.2d 1184, 1189 (10th Cir. 1978) (*en banc*) (Justice Department's *Petite* policy regarding no federal prosecution following a state prosecution for same transaction is a "housekeeping" provision that is at most a guide for federal prosecutors and it does not confer an enforceable right upon a criminal defendant)). [7] Therefore, "[e]ven assuming that strict compliance with informal

_____

[7] The district court further supported its rejection of Mr. Roberts' compliance argument with *State of Florida Dep't of Business Regulation v. United States Dep't of Interior*, 768 F.2d 1248, 1252-57 (11th Cir. 1985) ("the decision to acquire land is one within the Secretary's discretion," and neither the statute nor regulations provided law on which the court could base review of the decision), a case which we have since expressly rejected. *See McAlpine v. United States*, 112 F.3d 1429, 1433-35 (10th Cir. 1997). In *McAlpine*, we held the regulations "provide 'law to apply' in evaluating the Secretary's exercise of his discretion. . . . While the regulation [25 C.F.R. § 151.10] does not provide guidance on how the Secretary is to 'weigh' or 'balance' the factors, it does provide a list of objective criteria that the decisionmaker is required to consider in evaluating trust land acquisition requests." *Id.* at 1434. We also left open the possibility the statute itself provided for judicial review. *See id.* at 1432 & n.3. Pursuant to the Administrative Procedure Act, 5 U.S.C. § 702, therefore, "the proper standard for reviewing an agency's discretionary action, such as the Secretary's decision in this case, is to determine whether the agency acted in a manner that was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* at 1436. While we note *McAlpine* expressly rejects *Florida*, it does not change the outcome in this case because, at the time of the transaction, the formal regulations now governing trust acquisitions under 25 U.S.C. § 465 did not exist. Further, we have already indicated our agreement with the district court the Secretary substantially complied with the informal

(continued...)

16

policies and procedures was necessary for a valid acquisition of trust property, and Roberts' standing to assert such compliance argument, the testimony at the hearing thus revealed that the federal government substantially complied with the applicable policies and procedures." *Id.* at 1268. As a result, the Secretary and his delegates acquired the property for the United States in trust for the Choctaw Nation.

Beyond procedural validity, the government's actions in 1976 demonstrated its intent to treat the property as Indian Country:

> *[The government's actions] provided concrete evidence of the active involvement of the federal government in designating the tribal complex property as property for the use of the Choctaw Nation under the superintendence of the federal government.* Evidence of post-execution approval by the Area Director and a failure to file and return the approved deed constitute only incidental non-compliance with procedures not affecting the validity of an otherwise proper designation of trust property.

*Roberts*, 904 F. Supp. at 1268 (emphasis added). Unlike *Buzzard*, for example, where the government had taken no action to set aside the land, and the tribe unilaterally acquired and owned the land in fee simple like any other property owner, *see* 992 F.2d at 1076, here the Secretary followed procedures, albeit informal at the time, to acquire the property for the government in trust for the

---

[7](...continued)
procedures and, in any event, it is unlikely the informal procedures in place in 1976 create substantive rights enforceable by Mr. Roberts.

17

Choctaw Nation.  *See Roberts*, 904 F. Supp. at 1267-68.  Further, in *Buzzard*, there was no federal superintendence:

> [T]he federal government has not retained title to this land or indicated that it is prepared to exert jurisdiction over this land.  At most it has agreed to approve transactions disposing the land.  But the ability to veto a sale does not require the sort of active involvement that can be described as superintendence of the land.

992 F.2d at 1076.  Here, the United States retains title to the property; the state considers the property to be beyond its taxation jurisdiction; the BIA Area Director approved the land acquisition; the government continues to oversee the Tribal Complex property, as when it participated in a 1991 lease dispute between the Choctaw Nation and the Historical Association; and the BIA and Choctaw Nation treat the Complex as trust property.  *See Roberts*, 904 F. Supp. at 1265-67.  For all of these reasons, we agree with the district court the property in the present case is, unlike the land in *Buzzard*, Indian Country.

Mr. Roberts next argues that the future interest held by the Chamber of Commerce operates to defeat the trust status designation of the property.  The warranty deed which conveyed title to the United States in trust for the Choctaw Nation contains a provision that title to the subject property is conveyed only for "so long as said premises are used for purposes of the Choctaw Nation of Oklahoma."  Further:

> In the event the property is no longer used by the Choctaw Nation and upon the filing of a Declaration by the Secretary of the Interior

18

that said premises are no longer used by Choctaw Nation, the title shall revert to the Chamber of Commerce of the City of Durant to hold title in trust for the use and benefit of the Red River Valley Historical Society or other designee of the Chamber of Commerce of the City of Durant.

Mr. Roberts claims this future interest prevents the United States from exerting superintending control or jurisdiction over the Tribal Complex property. In support of this argument, Mr. Roberts again relies on *Buzzard*. While *Buzzard* reaffirmed the well-settled rule that "Indian country includes . . . land held in trust by the United States for the use of an Indian tribe," *id.* at 1076 (citing *Potawatomi*, 498 U.S. at 511), the case has no bearing on the future interest contained in the warranty deed in this case. Moreover, we completely agree with the district court, "the inclusion of a future interest which allows the Chamber of Commerce to take title to the tribal complex property upon the fulfillment of a contingency does not alter the trust status of the property." *Roberts*, 904 F. Supp. at 1267.

> By its very wording, this future interest is contingent in nature-- contingent on the land not being used by the Choctaw Nation and contingent on the filing of a declaration by the Secretary of Interior that the premises are not being used by the Choctaw Nation--and it cannot operate to defeat an otherwise valid exercise of superintending responsibility by the federal government as established by its approval of an acquisition in trust for the benefit of the Choctaw Nation. *The proper focus is on the federal government's superintending role and actions, not on the existence of a contingent property interest possessed by a third party. Any de minimus effect this future interest may have on the federal government's fee ownership in trust is more than overcome by the federal*

19

*government's undeniable supervisory role as evidenced by the Area Director's approval of the acquisition, the federal government's continued oversight of the tribal complex property, i.e, participation in the 1991 lease dispute between the Choctaw Nation and the Historical Association, and the continued treatment of the tribal complex property as trust property by the BIA and the Choctaw Nation.*

*Id.* (emphasis added). For all of these reasons the district court appropriately "reject[ed] Mr. Roberts' tortuous interpretation of *Buzzard* and f[ound] that the inclusion of the subject future interest on behalf of the Chamber of Commerce does not defeat the trust status of the tribal complex property, title to which is held by the United States in trust for the Choctaw Nation." *Id.*

Mr. Roberts finally argues the Secretary of the Interior lacks authority to take tribal lands into trust as a general matter because 25 U.S.C. § 465 unconstitutionally delegates standardless authority to the Secretary. The statute provides:

> The Secretary of the Interior is hereby authorized, in his discretion, to acquire through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments whether the allottee be living or deceased, for the purpose of providing land for Indians.
>
> For the acquisition of such lands . . . , there is authorized to be appropriated, a sum not to exceed $2,000,000 in any one fiscal year: Provided, That no part of such funds shall be used to acquire additional land outside of the exterior boundaries of Navajo Indian Reservation . . . in the event that legislation to define the exterior boundaries of the Navajo Indian Reservation . . . becomes law.
> . . . .

20

> Title to any lands or rights acquired pursuant to [the various sections] of this title shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

25 U.S.C. § 465. Mr. Roberts cites in support of his constitutional argument, *South Dakota v. United States Dep't of the Interior*, 69 F.3d 878 (8th Cir. 1995). In *South Dakota*, the Eighth Circuit held the section of the IRA authorizing the Secretary to acquire land in trust for Indians unconstitutional because it violated the nondelegation doctrine by providing no legislative standards governing the Secretary's acquisition, and therefore the Secretary lacked authority to acquire land in trust for the tribe. *Id.* at 885. However, the Supreme Court vacated that decision in *United States Dep't of the Interior v. South Dakota*, 519 U.S. 919, 117 S. Ct. 286 (1996) (granting certiorari, vacating and remanding to the Secretary of the Interior for reconsideration of his administrative decision); thus it has no precedential value to us.[8]

---

[8] In the alternative, Mr. Roberts argues even if the trust process can now survive a delegation challenge, it is only by virtue of the regulations enacted in 1980, and subsequently amended, which place additional limits on the Secretary's discretion and facilitate judicial review. *Cf. McAlpine*, 112 F.3d at 1432 n.3 (discussing amended regulations). He believes the process remained constitutionally flawed in 1976 when the Tribal Complex property was taken into trust. While his position finds some support in Justice Scalia's dissenting opinion in *Department of the Interior v. South Dakota*, 519 U.S. 919, 117 S. Ct. 286, 287 (1996), we disagree based on our belief the statute itself provides standards for the Secretary's exercise of discretion.

The Supreme Court did not publish a majority opinion when it granted, vacated and remanded *South Dakota*; thus, we do not know the Court's reasoning on the issue of 25 U.S.C. § 465's standards. However, we have previously acknowledged the statute itself places limits on the Secretary's discretion. *See McAlpine*, 112 F.3d at 1432 n.3 (citing *South Dakota*, 69 F.3d at 887-88 (Murphy, J. dissenting)). For our discussion, it is helpful to recall the statutory standards observed by Judge Murphy. For example, the statute provides any land must be acquired for Indians as defined in 25 U.S.C. § 479 and funds appropriated for the acquisitions may not be used to provide land for Navajos outside their reservation boundaries. *See South Dakota*, 69 F.3d at 887-88 (Murphy, J., dissenting). And, the legislative history identifies goals of "rehabilitating the Indian's economic life" and "developing the initiative destroyed by . . . oppression and paternalism," of the prior allotment policy and indicates the Secretary must assure continued "beneficial use by the Indian occupant and his heirs." *Id*.[9] Mr. Roberts has not argued the Secretary abused his discretion by transgressing any of these standards.

_____

[9] Moreover, the Supreme Court has only twice in its history, and not since 1935, invalidated a statute on the ground of excessive delegation of legislative authority; since 1935, the "Court has consistently upheld statutes involving broad delegations of authority." *South Dakota v. United States Dep't of the Interior*, 69 F.3d 878, 886 (8th Cir. 1995) (and citations therein) (Murphy, J., dissenting).

We agree with the district court Congress properly delegated to the Secretary of the Interior authority to make such acquisitions, *see* 25 U.S.C. § 465, and the Secretary then granted a delegation of general authority to the Commissioner of Indian Affairs, *see* 39 Fed. Reg. 32166-67, who redelegated his authority to the Bureau of Indian Affairs Area Directors. *See* 34 Fed. Reg. 637-38. Consequently, "the Area Director possessed the delegated authority to take title to the tribal complex property in trust for the Choctaw Nation in 1976." *Roberts*, 904 F. Supp. at 1269.

Mr. Roberts' many arguments about the invalidity of the trust process, in this instance and in general, must finally be put to rest. In sum, we believe the Secretary properly exercised his discretion to acquire the Tribal Complex property in trust for the Choctaw Nation pursuant to 25 U.S.C. § 465, and there is evidence of federal set-aside and superintendence. We reject the delegation argument and are equally unpersuaded the Secretary's actions merit reversal. As a result, the property is Indian Country for purposes of the Major Crimes Act, and no procedural or administrative defect nullifies this status. The district court did not err in asserting jurisdiction over the alleged offenses in this case.

## III.

Mr. Roberts next argues the jury, not the judge, should have decided whether the Tribal Complex was Indian Country, and, in the alternative, the

23

evidence was insufficient to support a jury finding the offenses occurred in Indian Country. We address these arguments in turn.

The statutes under which Mr. Roberts was charged, 18 U.S.C. § 2241 (aggravated sexual abuse) ; 18 U.S.C. § 2242 (sexual abuse); and 18 U.S.C. § 2244 (abusive sexual contact), all require the offenses have occurred "in the special maritime and territorial jurisdiction of the United States." The Major Crimes Act provides:

> Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnaping, maiming, a felony under chapter 109A [sexual abuse], incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years, arson, burglary, robbery, and a felony under section 661 of this title [embezzlement and theft] within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

18 U.S.C. § 1153(a). As we have already described, when Mr. Roberts moved to dismiss for lack of subject matter jurisdiction, the court held a hearing and decided the Tribal Complex, site of some of the alleged offenses, was Indian Country, and therefore the court had jurisdiction over the case. At trial, the government sought to call witnesses to prove the Indian Country status of the land, and the court disallowed the testimony, stating:

> Well, you know, we have had a hearing on that and I have found that it is Indian Country, and it was necessary that it be Indian Country

24

before we even could – before I would even let you proceed. . . . And that's a legal issue and not a factual issue. And I will so instruct the jury.

At the close of arguments, the court instructed the jury, in part:

> The Government must prove each essential element of each offense beyond a reasonable doubt . . . .
>
> Each count requires proof of the commission of the offense within the territorial jurisdiction of the United States. In this case, the Court has determined that the Choctaw Nation Tribal Complex property located in Durant, Oklahoma, is in Indian Country, which is considered to be within the territorial jurisdiction of the United States. Consequently, no other proof or evidence is necessary to support the Government's claim that the alleged acts which allegedly took place on the Choctaw Nation's Tribal Complex property in Durant, Oklahoma, are within the territorial jurisdiction of the United States with respect to each of the counts of the indictment. The Court makes no such finding, however with respect to other locations you have heard discussed in this trial.

The court then reiterated "the defendant is charged in Counts 1, 3, 6 and 7 with abusive sexual contact in violation of 18 U.S.C. §§ 2242(1) and 2244(a)(2), which provide that *whoever in the territorial jurisdiction of the United States* engages in or causes sexual contact with or by another person by threatening or placing that other person in fear will be guilty of the offense of abusive sexual contact." (emphasis added). Instructing on the remaining counts, the court again articulated the "*whoever in the territorial jurisdiction of the United States*" requirement of 18 U.S.C. 2241(a)(1) (attempting aggravated sexual abuse) (Counts 2 and 4) and 18 U.S.C. § 2242(1) (attempted sexual abuse) (Count 5). The court also stated to the

25

jury that it was the ultimate judge of the facts and ordered, "You must consider these instructions as a whole and not just a part of them to the exclusion of the rest."

When the instructions were proposed by the court, defense counsel objected, "There is one [instruction] . . . that refers to Indian Country where you advise the jurors that that element of the offense has been decided by the Court. And we object to that on the grounds that we regard it as a mixed question of law and fact and the material elements of the offense which the jury should have the right to adjudicate." Before the jury received the instructions, the defense renewed its Indian Country objection. The court overruled the objections.

Mr. Roberts contends the instructions relieved the government of its burden of proving an essential element of the crime by failing to provide evidence at trial the Tribal Complex was Indian Country. *See In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068 (1970) (the government must prove every element of an alleged crime beyond reasonable doubt). But the government maintains the trial court's instruction the Tribal Complex was, as a matter of law, Indian Country did not improperly remove from the province of the jury any factual inquiry. Further, the court appropriately explained the law and left the jury to determine the essential element of whether the alleged offenses occurred at the Tribal Complex.

We have previously explained, "an error in jury instructions will mandate reversal of a judgment only if the error is determined to have been prejudicial, based on a review of the record as a whole." *See Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1271 n.19 (10th Cir. 1988) (citing *Durflinger v. Artiles*, 727 F.2d 888, 895 (10th Cir. 1984). Reviewing the entire record, we determine whether the instructions "state[d] the law which governs and provided the jury with an ample understanding of the issues and the standards applicable." *Ramsey v. Culpepper*, 738 F.2d 1092, 1098 (10th Cir. 1984). We "consider all that the jury heard and, from the standpoint of the jury, decide not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine these issues." *Durflinger*, 727 F.2d at 895 (internal quotations omitted).

We agree with Mr. Roberts that a jury verdict, if based on an instruction allowing it to convict without properly finding the facts supporting each element of the crime, is error, *see Sandstrom v. Montana*, 442 U.S. 510, 523, 99 S. Ct. 2450 (1979), and the facts essential to conviction must be proven beyond the jury's reasonable doubt, not the court's. *See Connecticut v. Johnson*, 460 U.S. 73, 86, 103 S. Ct. 969 (1983). However, we believe Mr. Roberts confuses the legal issue of jurisdiction with the factual question of locus of the offense.

27

As a general matter, the trial court decides the jurisdictional status of a particular property or area and then leaves to the jury the factual determination of whether the alleged crime occurred at the site. *See United States v. Hernandez-Fundora*, 58 F.3d 802, 812 (2d Cir. 1995) (district court may determine a federal prison falls within the special maritime and territorial jurisdiction of the United States and remove that matter from the jury); *United States v. Warren*, 984 F.2d 325, 327 (9th Cir. 1993) (district court may determine a military base satisfies federal jurisdictional requirements); *United States v. Bridges*, 43 F.3d 1468 (table), 1994 WL 687301, *1 (4th Cir. 1994) (In a trial for robbery within the special maritime and territorial jurisdiction of the United States, "it is well established that a court may determine, as a matter of law, the existence of federal jurisdiction over the geographic area, but the locus of the offense within that area is for the trier of fact.").

Similarly, a trial court also acts appropriately when it makes the jurisdictional ruling a particular tract of land or geographic area is Indian Country, and then instructs the jury to determine whether the alleged offense occurred there. In *United States v. Deon,* 656 F.2d 354 (8th Cir. 1981), the defendant challenged the jury instruction, "the Court has found as a matter of law that Pine Ridge, South Dakota, the site of the alleged offense, is in Indian

Country.  You are therefore instructed that this Court's jurisdiction has been established."  *Id.* at 357.  The Eighth Circuit held:

> The jury was not told, as a matter of law that an offense
> had occurred, only that the site of the alleged offense,
> Pine Ridge, South Dakota, was in Indian Country.  This
> instruction, reduced to its essentials, finds as a matter of
> law only that Pine Ridge is in Indian country.

*Id.*  Similarly, in  *United States v. Sohappy*  , 770 F.2d 816 (9th Cir. 1985), the Ninth Circuit reviewed the trial court's instruction the jury determine whether violations of  Lacey Act prohibitions against transporting, selling, or acquiring fish taken in violation of tribal law occurred at two sites.  *Id.* at 822.  Because "the issue of what constitutes Indian country is a matter for the judge and not the jury," and the trial judge "was apparently satisfied the two sites were Indian country," there was no plain error in instructing the jury only that it must find whether the violations occurred at the sites.  *Id.* at 822 & n.6.  In  *United States v. Cook* , 922 F.2d 1026 (2d Cir. 1991), an appeal from conviction for criminal use and possession of gambling devices, the defendants challenged the court's ruling from the bench a certain area was Indian Country.  *Id.* at 1031-32.  The Second Circuit held, "the question of whether the St. Regis territory is Indian country was one properly decided by [the trial] [j]udge . . . without submission of the issue to the jury."  *Id.*

Several circuits have had the opportunity to state, in dicta, the trial court should *not* submit to the jury the question of whether a particular tract of land or geographic area is Indian Country. In ***United States v. Stands***, 105 F.3d 1565 (8th Cir. 1997), the defendant argued the court had erroneously required the jury to determine whether the alleged site was Indian Country when it convicted him of charges arising out of a kidnaping and assault. ***See id.*** at 1575-76. The court agreed, "given a particular piece of land, it is for the court, not the jury, to determine whether that land is in Indian country." ***Id.*** at 1575. Therefore, "[i]t may have been error [albeit nonreversible] for the District Court to submit to the jury the narrow question of whether the alleged site of the offense was Indian country." ***Id.*** at 1576. Similarly, in ***United States v. Levesque***, 681 F.2d 75 (1st Cir. 1982), the First Circuit considered the defendant's contention it was error to submit to the jury the question of whether or not the locus of an alleged assault was in Indian Country. ***Id.*** at 78. Whether the geographic area satisfied the dependent Indian community category of Indian Country, the court explained, was "a jurisdictional fact susceptible of determination without reference to any of the facts involved in determining defendants' guilt or innocence," but any error in submitting to the jury this jurisdictional question did not provide cause for reversal. ***Id.***

We agree with our sister circuits the district court can find, as a matter of law, a geographic area or particular location is Indian Country, and then instruct the jury to determine factually whether the offense occurred there. In Mr. Roberts' case, the jury instructions neither diminished the government's burden of proof, nor relieved the jury of its responsibility to find all essential elements of the offenses.

Mr. Roberts argues that in any case, the jury had insufficient evidence to find the alleged offenses occurred at the Tribal Complex. We review *de novo* all evidence, both direct and circumstantial, together with all reasonable inferences in the light most favorable to the prosecution, to determine whether a reasonable jury could find the essential elements of a crime beyond a reasonable doubt. ***See United States v. Gonzales***, 58 F.3d 506, 508-09 (10th Cir. 1995). We also presume the jury resolved evidentiary conflicts in favor of the prosecution, and we defer to the jury's resolution. ***See Messer v. Roberts***, 74 F.3d 1009, 1013 (10th Cir. 1996).

The jury heard numerous alleged victims and witnesses testify most of the offenses occurred in Mr. Roberts' office at the Tribal Complex; it also heard evidence about alleged offenses that may have transpired elsewhere. The jury appears to have carefully weighed the evidence in light of the judge's legal instructions on jurisdiction. On Counts I, II, and VI, alleging acts occurring at

31

the Tribal Complex, the jury returned guilty verdicts, but on Count VII, for example, where the testimony was conflicting as to whether the incident occurred at the Tribal Complex or in Hugo, Oklahoma, the jury resolved the question in favor of the defendant. We believe the jury had sufficient evidence to make the factual determination several alleged offenses occurred at the Tribal Complex which the court had properly instructed as a matter of law to be Indian Country.

## IV.

Mr. Roberts contests the district court's decision to admit, as evidence of extrinsic acts, the testimony of women who were not the victims of charged offenses. Originally the district court conducted the required balancing inquiry of Fed. R. Evid. 403, and excluded the evidence on the ground its potential prejudice substantially outweighed its probative value. In an interlocutory appeal to this court, the government challenged the exclusion.

We "remand[ed] the Fed. R. Evid. 404(b) issue concerning the nine additional women to the district court for an appropriate hearing to determine whether the government has established that Mr. Roberts engaged in a common scheme to abuse sexually women subject to his authority and whether each

woman's testimony fits this pattern." ***United States v. Roberts***, 88 F.3d 872, 875

(10th Cir. 1996). [10]  We opined:

> [t]he government must produce additional information about the
> details of each of the nine women's proposed testimony before a firm
> conclusion on this issue is possible.  The district court must make
> this determination in the first instance on remand after holding an
> appropriate pretrial hearing.

*Id.* at 881.  Mr. Roberts argues the district court improperly followed our remand

order, and rather took our decision as authorization to automatically admit the

testimony under Rule 404(b).

On remand, the district court held an *in camera* hearing where the

government presented the testimony of the three women named in the indictment

and seven other women who alleged Mr. Roberts sexually abused them.  The

government relied on its proffer and an FBI 302 statement as to an eighth

woman's testimony.  Noting the evidence established a steady stream of similar

conduct occurring between 1977 and 1993, the district court decided to allow

testimony showing Mr. Roberts' conduct toward tribal employees under his

authority was "strikingly similar" to the charged acts.

We review a decision to admit evidence under Fed. R. Evid. 404(b) for

abuse of discretion.  ***United States v. Deninno***, 29 F.3d 572, 577 (10th Cir.

---

[10] On other grounds, not relevant to this issue, ***United States v. Roberts***, 88
F.3d 872 (10th Cir. 1996), was superceded by statute as stated in ***United States v.
Meacham***, 115 F.3d 1488 (10th Cir. 1997).

1994).  Rule 404(b) prohibits the government from offering evidence of other crimes, wrongs, or acts to demonstrate the bad character, moral turpitude, or criminal disposition of a defendant to prove he acted in conformity with the prior acts or events.  However, the rule permits the introduction of such evidence for other approved purposes, including to demonstrate a defendant's identity or intent to commit a crime by demonstrating a common scheme or plan.  *See United States v. McGuire*, 27 F.3d 457, 460-61 (10th Cir. 1994).  Following the Supreme Court's decision in *Huddleston v. United States*, 485 U.S. 681, 691-92, 108 S. Ct. 1496 (1988) (outlining the four procedural safeguards governing admission decisions under Rule 404(b)), we have adopted an "inclusive approach" to admitting evidence under this rule.  *United States v. Record*, 873 F.2d 1363, 1375 (10th Cir.1989), 485 U.S. 681 (1988).  We have listed the requirements as:

> (1) the evidence must be offered for a proper purpose;  (2) the evidence must be relevant;  (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice;  and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

*United States v. Jefferson*, 925 F.2d 1242, 1258 (10th Cir. 1991);  *see also United States v. Wacker*, 72 F.3d 1453, 1468 (10th Cir. 1995);  *Huddleston*, 485 U.S. at 691-92.

Contrary to Mr. Roberts' contention, the district court did follow our order by holding a hearing, making findings about the probative value of the evidence, and excluding testimony that did not show common plan or intent. Consistent with our direction, the court issued an order evaluating the proposed testimony of seven women under Rule 404(b). The court recalled the government's rationale was to show a common scheme of sexually abusive behavior committed against female employees of the Choctaw Nation, and the defendant's knowledge he could, by virtue of his position, abuse young female employees without fear of reprisal. It concluded "with respect to six of the . . . women, th[e] probative value of their proposed testimony is not substantially outweighed by its potential for unfair prejudice." The court made detailed findings:

> The court makes this finding as to witnesses Maddux, Ward, Byrd, McWilliams, Cole and Knight. Each witness was employed by the Choctaw Nation when the sexually abusive behavior by Roberts was directed toward them. Roberts was in a position of authority over each of them. He was the Chief of the Choctaw Nation and he represented the ultimate hiring and firing authority for the Choctaw Nation. According to the testimony, he utilized his influence and control over these women in such fashion that they were constantly subjected to his advances as part of their employment. Most, if not all of these incidents, took place with no witnesses and in areas not visible to other individuals. Each encounter was apparently prompted by a request by Roberts for a one-on-one meeting. *The testimony of these seven women regarding Roberts' conduct is strikingly similar to the testimony of the three individuals named in the indictment – Russ, Gilbert, and Grammar.*

(emphasis added).  For these reasons, the court allowed the jury to hear the testimony of the six women under Rule 404(b).  However, it disallowed the testimony of a seventh woman, Ms. Hughes, because:

> Hughes never worked for the Choctaw Nation and was never under the control of Roberts or subject to his authority in any respect related to employment with the Choctaw Nation.  The testimony of Hughes does not fit within the stated rationale of the government in introducing such testimony to establish Roberts' scheme to sexually abuse those women under his authority.  Consequently, Hughes' testimony is not admissible.

The court also disallowed Ms. Maddux's proposed testimony about an event that took place before she was employed by the Choctaw Nation.

We believe the district court followed our remand order and decided correctly, under *Huddleston*, *Jefferson,* and *Wacker,* the six women's testimony was admissible to show a common scheme.  Addressing Mr. Roberts' contention the six women would testify to events too remote in time from the charged offenses, the court appropriately disagreed because "the testimony presented tends to establish a long-standing pattern of sexually abusive behavior on the part of Roberts from 1977 continuing up until the time of the charges contained in the indictment."  *See United States v. Cuch*, 842 F.2d 1173, 1178 (10th Cir. 1988) (When considering the prejudicial effect of other bad acts which are temporally remote, we follow "no absolute rule regarding the number of years that can separate offenses.  Rather, the court applies a reasonableness standard and

36

examines the facts and circumstances of each case"); *see also Wacker*, 72 F.3d at 1469 (testimony showing a long-standing pattern of drug activity from the late 1970's until the time of defendants' arrest in 1990 was evidence integrally related to the charges and not too remote).

In the alternative, the government tells us the evidence was admissible under Rule 413 allowing evidence of uncharged sexual crimes for "its bearing on any matter to which it is relevant." Although we previously held that rule inapplicable to Mr. Roberts' case under its original effective date language, *see Roberts*, 88 F.3d at 875, Congress has subsequently overruled our narrow interpretation of the effective date language. *See United States v. Enjady*, 134 F.3d 1427, 1429-30 (10th Cir. 1998). [11] Whether under Rule 404(b) or Rule 413,

---

[11] *United States v. Enjady*, 134 F.3d 1427, 1429 (10th Cir. 1998), describes:

> [W]e held in *United States v. Roberts*, 88 F.3d 872, 879 (10th Cir.1996), that "rule [413] was not intended to apply to criminal cases already pending as of the rule's effective date." We declined to apply Rule 413 to an indictment filed before July 1995. In September 1996 Congress responded to *Roberts*, calling it an "erroneously restrictive interpretation of the effective date language for the new rules." 142 Cong. Rec. H12051-04 (1996). Congress amended the effective date language to provide that new Rules 413- 415 "shall apply to proceedings commenced on or after the effective date of such amendments, including all trials commenced on or after the effective date of such amendments." Pub.L. No. 104-208, Div. A, Tit. I,

(continued...)

therefore, the district court did not abuse its discretion in holding two evidentiary hearings consistent with our remand order and making findings supporting the admissibility of some of the women's testimony, while excluding others'.

## V.

Mr. Roberts next complains that in opening and closing arguments the prosecutor improperly vouched for witness credibility and referred to evidence not in the record. Although he did not object at trial, he now contends the remarks were improper and prejudicially affected his substantial rights, therefore, amounting to prosecutorial misconduct. *See United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991). Where, as here, a defendant does not make a contemporaneous objection to the prosecutor's argument, the standard of review on appeal is for plain error. *See United States v. Russell*, 109 F.3d 1503, 1514 (10th Cir. 1997).

Mr. Roberts draws our attention to several statements:

(A) The prosecution's case against the defendant will center in large measure around the direct, first-hand and forth-right testimony of those courageous women, all of whom will present shockingly and strikingly similar testimony of sexual attacks committed over a

---

[11](...continued)
§ 101(a). Thus Congress overruled that part of *Roberts* that had narrowly interpreted the original effective date language. The purpose and effect of this amendment was for Rules 413- 415 to apply to all trials commenced after July 10, 1995. Fed.R.Evid. 413(e).

number of years by this powerful and influential man, Hollis Earl Roberts.

(B) Words can't really express our appreciation for your consideration of the testimony of the ten women.

(C) If the United States Attorney's Office were after the defendant, why wouldn't we have indicted him on that charged [sic]?  We had a grand jury investigation.  If this was a kangaroo kind of a deal, why not charge him with it?

(D) It's tough to prove that beyond a reasonable doubt, isn't it?  So what did we do?  Did we go after him?  Did we scour the country in 1990?  No.  We waited until . . . .  We did nothing until more evidence was presented to the United States Attorney's Office, . . . and only then did the United States Attorney's Office move into action.  There is not one piece of evidence in this case that John Raley, Linda Epperly, or Shelly Sperling has one interest whatever in intervening in the political affairs of the Choctaw Nation of Oklahoma, not one piece of evidence.  He says that pretty eloquently.  It sounded good, but the evidence didn't establish that.

(E) Hollis called next Monday.  What did he do?  He apologized, "sorry for raping you or sorry for attempting to rape you, in effect.  Hollis resigned."

(F) Why were these women here – Angie Gilbert, Kobi Russ, Misty Grammar, Kathy Cole, Mary Watson, Tanya Parker, Jana Byrd, Micah Knight, Kristina Hughes, Kim Maddox, they are here for one thing.  They want you to believe them.

The government responds the prosecutor's statements were proper if viewed in context.  *See Darden v. Wainwright*, 477 U.S. 168, 179, 106 S. Ct. 2464 (1986). Statement A, the government argues, was an "appropriate prediction of testimony" borne out at trial and Statement B, "a proper prosecutorial expression of thanks to the jury for its time and attention."  In Statements C and D the

government explained how it had to rebut Mr. Roberts' argument the charges against him were "part of a political conspiracy masterminded by Doug Dry," and that its questioning of government witnesses revealed nothing improper in their motives for testifying. Statement E was "an accurate reflection of what Mr. Roberts, *in effect*, told [Ms. Parker]," and is supported in the record. And Statement F was "made in response to defense arguments that the testimony of the uncharged offense victims should be ignored as 'piling on' in an 'over-prosecuted case.'"

Further, the prosecutor explicitly disclaimed any ability to vouch for witness credibility, and the judge's instructions to the jury cured any error. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 644, 94 S. Ct. 1868 (1974). In rebuttal, the prosecutor said, "I can't vouch for things that didn't appear in the record. And if anything that I say appears to be such, please discard it. If anything I say appears to be inconsistent with your honest recollection of the facts, I expect and I encourage you to follow your individual and your collective recollection of the evidence and the testimony in this case." After closing arguments, the court charged the jury, "the statements and arguments of these lawyers are not evidence." Given the context of the statements, curative instructions, and abundance of testimonial evidence on which the jury could have based its verdict, we do not believe the prosecutor's comments merit reversal of

40

Mr. Roberts' conviction; at most, the comments were harmless error. *See United States v. Hasting*, 461 U.S. 499, 507-09, 103 S. Ct. 1974 (1983).

## VI.

Finally, Mr. Roberts argues he should not have received a sentencing enhancement for abuse of a position of trust pursuant to U.S.S.G. § 3B1.3. We review the district court's factual findings under the clearly erroneous standard and review its applications of the Sentencing Guidelines de novo. *See United States. v. Roberts*, 14 F.3d 502, 522-23 (10th Cir. 1993).

Based on his Criminal History Level of I, Mr. Roberts was sentenced to 26 months' imprisonment on Counts 1 and 6, served concurrently with a 135-month sentence on Count 2. The sentence included a two-level enhancement for abuse of public trust. The Guidelines provide, "if the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by **2** levels." U.S.S.G. § 3B1.3 (1995). The application notes to the Guidelines further explain:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference. Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult).

41

*Id.* at n.1. Mr. Roberts does not believe he abused a position of public trust. He attempts to bolster this argument with *United States v. Brunson*, 54 F.3d 673, 677-78 (10th Cir. 1995) (in a fraudulent, but otherwise "normal arms-length commercial relationship," abuse of trust enhancement was improperly applied because no fiduciary or personal trust relationship existed between the two principals), and *United States v. Custodio*, 39 F.3d 1121, 1125-26 (10th Cir. 1994) (requiring something more than a business partnership for an abuse of a position of trust enhancement).

These cases are inapposite and do not obscure that Mr. Roberts was the longtime tribal Chief who could, and did, call subordinate female employees to his private office at the tribal headquarters where he then sexually abused them, secure in the knowledge the power and influence of his position would allow him to engage in these repeated attacks, over the course of many years, without oversight. Several women testified they did not initially report him out of fear he would use his power and influence to retaliate, either by terminating their employment, denying family members tribal benefits, or causing physical harm to them. When this case became public, family members of several victims acknowledged Mr. Roberts' behavior, but urged the women not to participate. Because she agreed to testify, at least one woman no longer has contact with her parents, and others maintain strained relationships with family members. Beyond

42

the victims and their families, Mr. Roberts appears to have exerted significant influence over employment, economics, politics, and daily life of all members of the Choctaw Nation and the entire town of Durant, Oklahoma. As a result, even after acknowledging the abuse and assaults, many individuals were wary of supporting the victims of the offenses, and, in fact, strongly encouraged the women to maintain their silence.

The evidence clearly reveals "more than a mere showing that the victim had confidence in the defendant," *see Brunson*, 54 F.3d at 678; and "the position . . . allow[ed] him to make the wrongs more difficult to detect." *See Custodio*, 39 F.3d at 1126. We see no reason to disturb the enhancement for abusing a position of public trust that significantly facilitated the commission or concealment of the offense.

Next Mr. Roberts argues the more lenient 1992 version of the guideline, which provides, "the position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons," U.S.S.G. § 3B1.3 n.1, should have been applied instead of the 1995 version which omitted this language. But the district court ruled the sentence enhancement applicable under either the 1992 or 1995 version of the Guidelines. *See United States v. Underwood*, 938 F.2d 1086, 1088 (10th Cir. 1991) ("The court, at the time of

sentencing, shall state in open court the reasons for its imposition of the particular sentence.") (quoting 18 U.S.C. § 3553(c)). We need not resolve the question of which Guideline applies if the sentence falls within either Guideline range or the sentencing judge holds the same sentence could have been imposed under either Guideline. *Cf. United States v. Urbanek*, 930 F.2d 1512, 1516 (10th Cir. 1991) ("Unless the district court makes it clear during the sentencing proceeding that the sentence would be the same under either of the applicable Guideline ranges, we are compelled to remand for resentencing when we find, as we do here, that an improper offense level was applied.") (following *United States v. Bermingham*, 855 F.2d 925, 931-35 (2d Cir. 1988) (dispute about applicable Guidelines need not be resolved where the sentence falls within either of two arguably applicable Guideline ranges and the same sentence would have been imposed under either). Finding no error, we affirm the district court's application of the enhancement for abusing a position of public trust.

## VII.

We believe the district court properly premised jurisdiction on its legal conclusion the locus of the alleged criminal offenses, the Tribal Complex, was Indian Country for purposes of 18 U.S.C. § 1153. It then properly instructed the jury the Tribal Complex was Indian Country and left to the jury the factual question of whether the offenses occurred at the Tribal Complex. The district

44

court did not misinterpret our remand instructions when it held an evidentiary hearing and admitted testimony.  Finally, neither prosecutorial conduct nor sentencing merits reversal.  For these reasons, we **AFFIRM**.