**F I L E D**
**November 9, 2005**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**      **Clerk of Court**

**TENTH CIRCUIT**

---

SHIVWITS BAND OF PAIUTE
INDIANS and KUNZ & COMPANY,
d/b/a KUNZ OUTDOOR
ADVERTISING,

      Plaintiffs - Counterclaim
      Defendants - Appellees,

v.

STATE OF UTAH; UTAH STATE
DEPARTMENT OF
TRANSPORTATION; ST. GEORGE
CITY, a Utah Municipal corporation,

      Defendants - Counterclaim
      Plaintiffs - Appellants,

GAYLE NORTON, in her capacity as
Secretary of the United States Department
of the Interior; NEAL A. McCALEB, in
his capacity as Assistant Secretary of the
Interior Indian Affairs; WAYNE
NORDWALL, in his capacity as Area
Director of the Bureau of Indian Affairs;
and the BUREAU OF INDIAN
AFFAIRS,

      Third-Party Defendants -
      Appellees.

No. 03-4274

Brian L. Farr, Assistant Attorney General (Philip C. Pugsley, Assistant Attorney General and Mark L. Shurtleff, Attorney General, with him on the briefs), Utah Attorney General's Office, Salt Lake City, UT, for Defendants-Counterclaim Plaintiffs-Appellants.

John Fredericks III, Fredericks, Pelcyger & Hester, LLC, Louisville, CO, for Plaintiff-Counterclaim-Defendant-Appellee Shivwits Band of Paiute Indians.

D. Williams Ronnow, Jones, Waldo, Holbrook & McDonough, St. George, UT, for Plaintiff-Counterclaim-Defendant-Appellee Kunz & Company, d/b/a Kunz Outdoor Advertising America.

Ellen J. Durkee, Attorney, Environment & Natural Resources Division, United States Department of Justice, Washington, DC (Todd S. Aagaard, Attorney, United States Department of Justice, Washington, DC, Thomas L. Sansonetti, Assistant Attorney General, Washington, DC, Paul M. Warner, United States Attorney, Salt Lake City, UT, John K. Mangum, Assistant United States Attorney, Salt Lake City, UT, Thomas A. Blaser, of counsel, Office of the Solicitor, United States Department of the Interior, Washington, DC, and William R. McConkie, Office of the Regional Solicitor, United States Department of the Interior, Salt Lake City, UT, with her on the briefs), for the Federal Appellees.

Before **BRISCOE, KELLY,** and **LUCERO**, Circuit Judges.

**BRISCOE**, Circuit Judge.

The State of Utah, the Utah State Department of Transportation, and the City of St. George, Utah (collectively the defendants), appeal from the district court's grant of summary judgment in favor of plaintiffs Kunz and Company and the Shivwits Band of Paiute Indians holding that defendants lacked authority to regulate billboard advertising

2

displays erected by Kunz on land held in trust by the federal government for the Band. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

*Factual background*

In July 1993, Kunz and Company, d/b/a Kunz Outdoor Advertising (Kunz), a California corporation, approached the Shivwits Band of Paiute Indians (the Band) and proposed that the Band purchase, with money provided by Kunz, land south of St. George, Utah (the City) along the Interstate 15 corridor, transfer that land to the federal government to be held in trust for the Band, and lease the land to Kunz on a long-term basis so that Kunz could erect and maintain advertising billboards thereon. The Band, eager to pursue economic development opportunities that would increase its meager revenue stream, accepted Kunz's proposal in October 1993. In November 1993, Kunz and the Band identified two parcels of land adjacent to Interstate Highway 15 in an undeveloped area within the City limits.[1] After several months of negotiations, the private owners of the parcels agreed in May 1994 to sell them to the Band.

The Bureau of Indian Affairs (BIA), aware of the relationship between Kunz and the Band, contacted the City's manager on July 7, 1994, orally advised him that the Band intended to purchase the two parcels of land, and asked if the City "would provide a letter

---

[1] The first parcel "consists of 14.25 acres with more than 1,147 feet of . . . frontage" on Interstate 15. App. at 174. The second parcel "consists of 11.07 acres" and "has approximately 771 feet of I-15 frontage . . . ." Id. Both parcels are located south of the Bloomington Exit on the east side of I-15 in the City. Id.

of support for this endeavor" to the Band. App. at 128A. The City's manager allegedly refused to provide such a letter because the City was "afraid the land would be used for the purpose of erecting outdoor advertising signs and the City was opposed to [such] signs." Id. On August 1, 1994, the BIA sent a letter to the City again stating that the Band was "in the process of purchasing two small parcels of land located in an undeveloped area of" the City. Fed. Aplee. Supp. App., at 1. The letter proceeded to identify the two parcels in detail by location and tax identification numbers. The letter concluded by again asking the City to support the Band's endeavor. According to the record, the City did not respond to the BIA's letter.[2] App. at 131.

On August 9, 1994, the Band purchased the parcels from the private owners. One day later, on August 10, 1994, the Band tendered a special warranty deed to the BIA that purported to transfer the parcels into trust. Because an off-reservation trust acquisition must be formally approved by the BIA, the Band also submitted an application and supporting documents to the BIA requesting such approval. Id. at 36, 128A, 131.

In reviewing the Band's application, the BIA concluded, consistent with its then-existing policies, that no environmental assessment (EA) was required for the act of taking the parcels into trust. App. at 36, 131. More specifically, the BIA classified as

_____

[2] At that time, applicable federal regulations did not require the BIA to notify either the state or local government of a proposed trust acquisition. App. at 150. The applicable federal regulations were subsequently modified, and now require the BIA to notify "the state and local governments having regulatory jurisdiction over the land to be acquired," and provide those governments with a thirty-day time period "in which to provide written comment as to the acquisition's potential impacts on regulatory jurisdiction . . . ." 25 C.F.R. § 151.11(d) (2004).

"categorically excluded" (i.e., not requiring an EA) any proposed trust acquisition in which there would be "no immediate change in the use of the land." Id. at 131. The BIA did, however, require an EA to be prepared regarding the proposed leasing of the parcels to Kunz and the related use of the land for outdoor advertising displays. That EA was completed on July 6, 1995. A "Finding of No Significant Impact" (FONSI) was subsequently issued by the BIA on August 31, 1995.

On the same date the FONSI was issued, i.e., August 31, 1995, the BIA approved the Band's request for approval of the trust acquisition and formally accepted the properties into trust. Thereafter, Kunz and the Band finalized, and the BIA approved, five separate leases covering the two parcels and permitting Kunz to erect and maintain a total of five advertising billboards thereon.

On October 25, 1995, shortly after Kunz began construction of the billboards, the Utah Attorney General's office, on behalf of the Utah Department of Transportation, threatened criminal suit against Kunz if the construction did not immediately cease. Kunz ignored the warning and continued construction. On November 3, 1995, the City issued a stop work order, forbidding Kunz from further construction of the signs on the grounds that it violated state and local outdoor advertising regulations, and Kunz had no city or state sign permits.

*Procedural background*

On November 17, 1995, Kunz and the Band filed this action against defendants seeking a declaratory judgment and preliminary and permanent injunctive relief. More

5

specifically, Kunz and the Band sought an order declaring that the property at issue was lawfully held by the Band, and injunctive relief restraining defendants from interfering with the construction and operation of the billboards. Defendants filed an answer and counterclaim against plaintiffs and a third-party claim against the United States. Id. The counterclaim and third-party claim alleged "that (1) the statute authorizing land acquisitions, 25 U.S.C. § 465 (and the accompanying regulation, 25 C.F.R. § 1.4) [wa]s unconstitutional; (2) the taking of the land in trust and the approval of the lease . . . violated the National Environmental Policy Act ("NEPA") and . . . [Department of the Interior (DOI)] . . . regulations; and (3) the erection of billboards on the property violate[d] certain state and local regulations." App. at 38.

The parties subsequently filed their first round of summary judgment motions.[3] On August 11, 2000, the district court issued an order ruling on those motions. In pertinent part, the district court concluded that: (1) 25 U.S.C. § 465 was not an unconstitutional delegation of legislative power; (2) the BIA acted arbitrarily and capriciously in determining that the acquisition of the land was subject to a categorical exclusion and that it was therefore unnecessary to conduct an EA prior to the acquisition; (3) the failure to comply with the procedural requirements of NEPA and conduct a pre-acquisition EA was "more than de minimus," App. at 15; and (4) "[t]he failure to prepare

---

[3] On February 7, 1996, the district court issued a preliminary injunction prohibiting defendants from imposing any stop work order or otherwise interfering with the construction or use of the billboards. Protected by this injunction, Kunz completed construction of the five billboards and leased the billboard space to various advertisers.

6

any NEPA review of the land acquisition was a procedural harm that frustrated NEPA's goals . . . ." Id. at 52. Accordingly, the district court ordered "that the required NEPA process be undertaken." Id. at 53. The district court's order stated, however, that the order "did not affect the fact that the government held the land in trust by special warranty deed . . . ." Id. at 60. Instead, it purported to "invalidate the agency's decision to take the land in trust until the BIA complied with the procedural requirements of NEPA." Id.

Defendants subsequently moved for summary judgment on the issue of whether they had authority to regulate the land at issue. In pertinent part, defendants argued that the two parcels of land were neither held in trust for the Band nor constituted "Indian Country." The district court denied defendants' motion on February 6, 2002. In doing so, the district court concluded that "the Indian Lands exemption in [the] Quiet Title Act, 28 U.S.C. § 2409a(a) . . , applie[d]," and thus "the government [wa]s immune from questions to the title" to the land. Id. at 61. The district court further concluded that, because the BIA "ha[d] not completed the NEPA process as was mandated [in] the [court's] August 11, 2000 order," there was "no final agency decision which settle[d] the status of the land at issue." Id.

On March 17, 2003, the district court conducted a status conference, at which time the BIA indicated it had completed the court-ordered EA and "ha[d] approved a Finding of No Significant Impact (FONSI) for the Shivwits Band fee-to-trust land transfer and outdoor advertising leases . . . ." Id. at 169. The BIA further indicated that it would not

7

"seek . . . to remove the land from trust status . . . or . . . remove approval of the five billboard leases."  Id.

At the direction of the court, the parties subsequently filed cross motions for summary judgment concerning the remaining issues in the case.  On October 22, 2003, the district court issued an order granting summary judgment in favor of the plaintiffs.  In that order, the district court concluded that defendants lacked "the authority to impose restrictions on the placement of billboards on" the land at issue.  Id. at 74.  More specifically, the district court concluded that because the land at issue was held in trust by the BIA for the Band, it constituted "Indian Country" under 18 U.S.C. § 1151 and thus was exempt from state and local regulation.  Id. at 77.  The district court also concluded "that even if the [Highway Beautification Act of 1966, 23 U.S.C. § 131,] applie[d] to the trust land at issue . . , the Act [wa]s subject to federal (not state) enforcement, and [thus] d[id] not expressly authorize the regulation intended by Utah and St. George."  Id. at 79.  On that same date (October 22, 2003), the district court entered a judgment in favor of plaintiffs stating the defendants "ha[d] no authority, express or implied, to regulate Kunz's placement of billboards on the subject property, held in trust for the" Band.  Id. at 90.

II.

Defendants assert a number of arguments on appeal.  Broadly speaking, defendants contend that the statute authorizing acquisition of the land is unconstitutional, that the acquisition of the land and approval of the lease agreements violated applicable

8

environmental laws and procedural regulations, and that they possess the authority to regulate the property and billboards at issue. As outlined in greater detail below, we find no merit to any of these arguments.

*Does § 465 of the Indian Reorganization Act violate the non-delegation doctrine?*

The trust acquisition of the properties at issue was completed pursuant to § 465 of the Indian Reorganization Act (IRA). Section 465 provides, in pertinent part, as follows:

> The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.

> For the acquisition of such lands, interests in lands, water rights, and surface rights, and for expenses incident to such acquisition, there is authorized to be appropriated, out of any funds in the Treasury not otherwise appropriated, a sum not to exceed $2,000,000 in any one fiscal year: Provided,
> That no part of such funds shall be used to acquire additional land outside of the exterior boundaries of Navajo Indian Reservation for the Navajo Indians in Arizona, nor in New Mexico, in the event that legislation to define the exterior boundaries of the Navajo Indian Reservation in New Mexico, and for other purposes, or similar legislation, becomes law.

> \* \* \*

> Title to any lands or rights acquired pursuant to this Act . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired . . . .

25 U.S.C. § 465.

In the course of the district court proceedings, defendants challenged the trust acquisition on the grounds that § 465 was "an unconstitutional delegation of legislative

power because it contain[ed] no limits on the Secretary's discretion and no standards against which a reviewing court c[ould] test the exercise of delegated power." Aplt. Br. at 8. The district court rejected that argument, noting that this court had rejected a similar argument in United States v. Roberts, 185 F.3d 1125 (10th Cir. 1999). Defendants now challenge the district's ruling on appeal. We apply a de novo standard of review. See United States v. Weed, 389 F.3d 1060, 1067 n.6 (10th Cir. 2004) ("We review challenges to the constitutionality of a statute de novo.") (internal quotations omitted).

Where, as here, a party has challenged a federal statute on the grounds that it violates the "nondelegation doctrine," "the constitutional question is whether the statute has delegated legislative power to the agency." Whitman v. American Trucking Assoc., Inc., 531 U.S. 457, 472 (2001). "Article I, § 1, of the Constitution vests '[a]ll legislative Powers herein granted . . . in a Congress of the United States.'" Id. "This text permits no delegation of those powers . . . and so [the Supreme Court] repeatedly ha[s] said that when Congress confers decisionmaking authority upon agencies Congress must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'" Id. (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928)).

In Roberts, a criminal case, the defendant was charged with and convicted of violations of the Major Crimes Act, 18 U.S.C. § 1153, which "confers on the United States exclusive jurisdiction over certain offenses . . . committed in Indian Country . . . ." 185 F.3d at 1129. On appeal, the defendant challenged the district court's exercise of

10

jurisdiction, arguing, in part, that § 465 of the IRA "unconstitutionally delegate[d] standardless authority to the Secretary" of the DOI. Id. at 1136. This court rejected the defendant's challenge to the constitutionality of § 465. In doing so, this court stated:

> [W]e have previously acknowledged the statute [§ 465] itself places limits on the Secretary's discretion. (citation omitted). * * * For example, the statute provides any land must be acquired for Indians as defined in 25 U.S.C. § 479 and funds appropriated for the acquisitions may not be used to provide land for Navajos outside their reservation boundaries. (citation omitted). And, the legislative history identifies goals of "rehabilitating the Indian's economic life" and "developing the initiative destroyed by . . . oppression and paternalism" of the prior allotment policy and indicates the Secretary must assure continued "beneficial use by the Indian occupant and his heirs." (citation omitted).

Id. at 1137. The Roberts' court also rejected the defendant's alternative argument that, "even if the trust process c[ould] . . . survive a delegation challenge, it [wa]s only by virtue of the [BIA] regulations enacted in 1980, and subsequently amended, which place[d] additional limits on the Secretary's discretion and facilitate[d] judicial review." Id. at 1136 n.8. More specifically, the Roberts' court stated: "we disagree based on our belief the statute itself provides standards for the Secretary's exercise of discretion." Id.

The decision in Roberts is clearly binding on the panel in this case, "absent en banc reconsideration or a superseding contrary decision by the Supreme Court." In re Smith, 10 F.3d 723, 724 (10th Cir. 1993) (per curiam). Obviously recognizing that rule, defendants assert that Whitman constitutes just such a superseding contrary decision by the Supreme Court. According to defendants, Whitman "modernized the non-delegation doctrine," Aplt. Br. at 8., by (a) clarifying that an agency cannot "cure an

11

unconstitutionally standardless delegation of power by declining to exercise some of that power," id. at 9-10 (quoting Whitman, 531 U.S. at 473), and (b) establishing that the necessary "intelligible principle" that must be laid down by Congress "must be found within the 'four corners of the statutory language' itself, rather than being inferred from the legislative history." Id. at 11 (quoting Whitman, 531 U.S. at 473).

We reject defendants' arguments. To begin with, only the first of the two principles cited by defendants is discussed in Whitman (i.e., that an agency cannot cure a non-delegation problem by declining to exercise some of the power). The second alleged principle, i.e., that the "intelligible principle" must be derived solely from the statutory text, rather than the legislative history, is nowhere to be found in Whitman. Rather, that "principle" comes from the Eighth Circuit's now-vacated decision in South Dakota v. United States Department of the Interior, 69 F.3d 878, 882 (8th Cir. 1995), *vacated by* 519 U.S. 919 (1996).[4] Moreover, a reading of the entire Whitman decision indicates that the Court did not rewrite or "modernize" the non-delegation doctrine. To the contrary, the Court reviewed in detail and applied its past precedent concerning the non-delegation doctrine. Importantly, for purposes of this appeal, that precedent was in existence at the

---

[4] A review of defendants' appellate brief suggests that they are relying not so much on Whitman, but rather on South Dakota, in which a panel of the Eighth Circuit, in a 2-1 decision, concluded that § 465 violated the non-delegation doctrine. Notably, however, the Supreme Court ultimately vacated that decision, with a majority of the Court choosing not to publish an opinion explaining their reasoning for doing so. Thus, the Eighth Circuit's decision has no precedential value. Moreover, the panel in Roberts made note of South Dakota, but ultimately chose to adopt the position of the dissenting judge in that case.

time this court issued its decision in Roberts. Moreover, it is worth noting that the Court in Whitman emphasized that it "ha[d] 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" 531 U.S. at 474-75 (quoting Mistretta v. United States, 488 U.S. 361, 416 (1989) (Scalia, J., dissenting)). Indeed, the Court noted that only on two occasions in its history (the last time in 1935) had it "found the requisite 'intelligible principle' lacking" in a challenged statute. Id. at 474.

Since the issuance of Whitman, the First Circuit has agreed with Roberts that § 465 does not amount to an unconstitutional delegation of legislative power. In reaching that conclusion, the First Circuit cited Whitman, but made no mention of it having altered or "modernized" the non-delegation principles that were in place when Roberts was decided. See Carcieri v. Norton, 398 F.3d 22, 32-34 (1st Cir. 2005).

In sum, we conclude Whitman does not constitute a "superseding contrary" decision that would allow us to ignore the holding in Roberts. Thus, consistent with Roberts, we reject defendants' assertion that § 465 of the IRA violates the non-delegation doctrine.

*Indian Lands Exception to Quiet Title Act*

Defendants contend the district court erred in concluding that the Indian lands exception to the Quiet Title Act (QTA) precluded it from reviewing and remedying any alleged shortcomings in the process of taking the land at issue into trust (i.e., the BIA's alleged failure to conduct a pre-acquisition EA). Because this issue implicates the district

13

court's subject matter jurisdiction, we review it de novo. See Neighbors for Rational Development v. Norton, 379 F.3d 956, 960 (10th Cir. 2004).

The QTA "contains a limited waiver of sovereign immunity" that "allows the United States to 'be named as a party defendant in a civil action . . . to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest in water rights.'" Neighbors, 379 F.3d at 961 (quoting 28 U.S.C. § 2409a(a)). Notably, however, the QTA "does not 'apply to trust or restricted Indian lands.'" Id. "'Thus, when the United States claims an interest in real property based on that property's status as trust or restricted Indian lands, the [QTA] does not waive the Government's immunity.'" Id. (quoting United States v. Mottaz, 476 U.S. 834, 843 (1986)).

"It is well settled law the [QTA's] prohibition of suits challenging the United States' title in Indian trust land may prevent suit even when a plaintiff does not characterize its action as a quiet title action." Id. Thus, in determining whether a particular claim falls within the scope of the QTA's prohibition, a reviewing court "must focus on the relief . . . request[ed]," rather than on the party's characterization of the claim. Id.

In Neighbors, an organization of landowners, business owners, and homeowners filed suit against the Secretary of the DOI alleging that she improperly placed into trust for nineteen Pueblos of New Mexico a parcel of land without first complying with NEPA. More specifically, the plaintiff organization alleged that the Secretary should have

14

conducted an EA prior to taking the land into trust because she contemplated a post-acquisition change in land use (i.e., transforming the property from a site once used for an Indian school to a site for commercial office space). The district court reviewed the plaintiff organization's claim on the merits and, after initially concluding that the Secretary's decision to accept the land into trust was arbitrary and capricious, ultimately "determined the Secretary had not acted arbitrarily and capriciously" in taking the land into trust. 379 F.3d at 960. The plaintiff organization then appealed the district court's ruling.

On appeal, this court agreed with the Secretary that the plaintiff's suit effectively challenged the United States' title to the property and thus fell within the scope of the QTA's Indian trust land exemption. In doing so, the court reviewed the legislative history of the QTA and concluded it was "clear" that "Congress' intent in excluding Indian trust lands from the [QTA's] waiver of sovereign immunity was to prevent adverse claimants from interfering with the United States' obligations to the Indians." Id. at 962. "Although [the plaintiff organization] [wa]s not an adverse claimant in the sense it [wa]s not seeking to gain title to the . . . property [at issue]," the court nevertheless concluded that "the Indian trust land exemption applie[d] with equal force . . . ." Id. According to the court, "[i]f Congress was unwilling to allow a plaintiff claiming title to land to challenge the United States' title to trust land," it was "highly unlikely Congress intended to allow a plaintiff with no claimed property rights to challenge the United States' title to trust land." Id.

15

The court in Neighbors also rejected the plaintiff organization's assertion that the Secretary's decision to take the land at issue into trust was reviewable under the Administrative Procedures Act. According to the court, "judicial review is only available under the Administrative Procedures Act and [the Secretary's] trust acquisition regulations if the United States has not yet acquired title to the property." Id. at 964. Because the United States had "already taken title to the" property at issue, the court concluded "judicial review [wa]s not available." Id. In other words, the court concluded "the Administrative Procedure[s] Act c[ould not] waive the United States' sovereign immunity because the [QTA] preclude[d] [the plaintiff organization's] suit to the extent it s[ought] to nullify the trust acquisition." Id. at 965.

Finally, the court in Neighbors rejected the plaintiff organization's request that the court permanently enjoin the Secretary from proceeding with or authorizing development of the land at issue until such time as the Secretary complied with the requirements of NEPA (i.e., by performing an EA). In the court's view, this request for relief effectively sought to have the "Secretary re-examine the decision to take the property into trust." Id. The court concluded, however, that "any claim seeking to re-examine issues unique to the trust acquisition [wa]s moot because the court [wa]s without authority to provide any relief." Id. More specifically, the court stated:

> Assuming for the sake of argument the district court considered the merits of [the plaintiff organization's] various claims and concluded the Secretary had not complied with the National Environmental Policy Act or the trust acquisition regulations, the district court could theoretically order the Secretary to now consider the appropriate factors. The district court,

16

however, has no power to divest the United States of the property and [the plaintiff organization] does not allege the Secretary has power to reconsider its decision. Requiring the Secretary to re-examine its trust acquisition decision would not provide [the plaintiff organization] with any meaningful relief and would be a waste of agency resources--not to mention the judicial resources that would be consumed in evaluating the sufficiency of the Secretary's initial considerations. Since the Secretary has acquired title to the property, the issue is moot.

Id.

The impact of Neighbors on the instant appeal is clear. In light of the QTA's Indian trust land exemption, Neighbors compels us to conclude that the district court in this case lacked subject matter jurisdiction over the defendants' counterclaim and third-party claim to the extent it sought to challenge the BIA's decision to take the property at issue into trust for the Band. Thus, the district court erred (in its August 11, 2000 order) in reviewing the trust acquisition and in turn concluding that the BIA acted arbitrarily and capriciously by failing to conduct a pre-acquisition EA. The district court also erred (again in its August 11, 2000 order) in directing the BIA to conduct a post-acquisition EA and in suggesting that the effect of its order was to "invalidate the agency's decision to take the land in trust until the BIA complied with the procedural requirements of NEPA." App. at 60. As made clear in Neighbors, the district court clearly lacked the "power to divest the United States of the property . . . ." 379 F.3d at 965. Notably, the district court ultimately concluded (in its February 6, 2002 order), and correctly so in light of Neighbors, that the Indian lands exemption in the QTA rendered the government immune from questions to the title to the land at issue.

17

In their appellate reply brief, defendants attempt to distinguish Neighbors on several grounds. First, defendants assert that the QTA's Indian land exemption does not bar "judicial review of final agency action pursuant to § 704 of the" Administrative Procedures Act. Aplt. Reply Br. at 5. This assertion, however, is directly undercut by the decision in Neighbors. Indeed, as outlined above, the court in Neighbors expressly held that the Administrative Procedures Act "cannot waive the United States' sovereign immunity because the [QTA] precludes [a] suit to the extent it seek[s] to nullify [a] trust acquisition."[5] 379 F.3d at 965.

Second, defendants assert that the instant case is distinguishable from Neighbors because the BIA "shield[ed] this project from known opposition . . . ." Aplt. Reply Br. at 5. In particular, defendants complain that the BIA gave notice of the proposed acquisition only to the City and not to the State of Utah. Id. Further, defendants complain that "[t]he City did not receive enough information to put it on notice that its outdoor advertising interests were at stake . . . ." Id. We disagree. To begin with, we note that the then-applicable federal regulations did not require notice to either the City or the State at the time the BIA was considering whether to accept the parcels at issue into trust for the Band. Further, notwithstanding the lack of any notification requirement, the record establishes that the BIA gave both oral and written notice to the City of the proposed acquisition. Lastly, we note that although the City allegedly raised concerns about outdoor advertising

_____

[5] To the extent defendants cite decisions from the Eighth, Ninth, and Eleventh Circuits allegedly supporting their assertion, those cases are clearly contrary to Neighbors and thus are not controlling here.

18

at the time it was given oral notice by the BIA of the project, the City thereafter remained silent, even after receiving written notice from the BIA regarding the proposed acquisition.

Third, defendants argue that in Neighbors, "both the Interior Board of Indian Appeals and the District Court . . . examined the merits of whether the Secretary followed the applicable laws" in taking the property at issue into trust. Aplt. Reply Br. at 6. In contrast, defendants argue, "the procedural transgressions [in this case] have never been reviewed on the merits." Id. There are least two flaws in this reasoning. First, although the City was given notice of the proposed acquisition, it failed to challenge the acquisition either prior to or following the BIA's approval of the acquisition. Thus, the fact that there was no review of the BIA's decision by the Interior Board of Indian Appeals rests directly on the City's shoulders. Second, the decision in Neighbors makes clear that the district court in that case lacked subject matter jurisdiction to review the trust acquisition. Thus, even though the district court in that case may have purported to "examine the merits of whether the Secretary followed the applicable laws" in taking the property at issue into trust, it clearly lacked authority to do so. In turn, then, defendants in this case cannot complain that they were wrongfully deprived of district court review of the acquisition.

Finally, defendants argue that, if nothing else, the decision in Neighbors should be reconsidered because it misinterpreted, and indeed is contrary to, an earlier decision of this court, McAlpine v. United States, 112 F.3d 1429 (10th Cir. 1997). In McAlpine, an individual member of the Osage Tribe purchased two parcels of land in southeastern Kansas and then requested that the Secretary of the DOI take the land into trust under §

19

465 of the IRA.  When the Secretary declined to do so, the tribal member first exhausted his administrative remedies and then filed suit in federal court seeking to compel the Secretary to accept his land in trust status.  The district court dismissed the case for lack of subject matter jurisdiction, ruling that the Secretary's decision was a non-reviewable discretionary act.  Alternatively, the district court concluded that the Secretary's decision was not subject to reversal because the Secretary had reviewed the relevant regulatory factors.  On appeal, this court rejected the district court's ruling that the Secretary's decision was a non-reviewable discretionary act, and instead concluded that the Secretary's decision was reviewable under the APA.  Id. at 1435.

We conclude that Neighbors is neither contrary to, nor requires a reexamination of, the decision in McAlpine.  In this regard, we note that in Neighbors, this court expressly distinguished McAlpine.  In particular, the court in Neighbors noted that the QTA "was not in play in McAlpine because the Secretary had not taken the title in trust."  379 F.3d at 963.  "Further," the court noted, "Mr. McAlpine was not seeking to divest the United States of its title in any Indian trust land."  Id.  Obviously, we are bound by the decision in Neighbors, absent *en banc* reconsideration or a supervening contrary decision by the Supreme Court.

*Was the EA conducted in good faith?*

Defendants contend that the final EA conducted by the BIA pursuant to the district court's August 11, 2000 order was inadequate and not completed in good faith because it was conducted after the land at issue had been acquired in trust and the leases executed

20

and approved. According to defendants, the district court should have directed the BIA to "invalidate the approval of the five leases as well as the trust acquisition." Aplt. Br. at 19.

We conclude this issue is moot. As discussed above, the district court lacked subject matter jurisdiction over defendants' counterclaims and third-party claims to the extent they sought to overturn the trust acquisition. In turn, the district court lacked authority to direct the BIA to conduct a post-acquisition EA reviewing the environmental effects of the acquisition. Finally, even assuming, for purposes of argument, that the EA conducted by the BIA at the behest of the district court was somehow inadequate, it is immaterial because there is no basis for reversing the trust acquisition.

*Applicability of Highway Beautification Act*

The final portion of the district court proceedings focused on the question of whether, assuming the validity of the trust acquisition and leases, the defendants nevertheless had the right to impose restrictions on the placement of the billboards on the land at issue. The parties filed cross motions for summary judgment on this issue. In an order dated October 22, 2003, the district court granted summary judgment in favor of the plaintiffs. App. at 73. In doing so, the district court first concluded that the property at issue constituted "Indian country," as that term is defined in 18 U.S.C. § 1151 (as noted by the district court, this statute governs the applicability of federal criminal laws, but has also been held to apply to questions of civil jurisdiction). The district court then rejected defendants' assertion "that Congress ha[d] explicitly authorized the imposition of Utah's and St. George's regulatory laws over the subject property through . . . the Highway

Beautification Act of 1966 [HBA] . . . ." Id. at 78. More specifically, the district court "conclude[d] that even if the HBA applie[d] to the trust land at issue here," it was "subject to federal (not state) enforcement, and the [HBA] d[id] not expressly authorize the regulation intended by Utah and St. George." Id. at 79. Based upon these conclusions (as well as others not relevant here), the district court held "that the State Defendants ha[d] no authority, express or implied, to regulate Kunz's placement of billboards on the subject property, held in trust for the" Band. Id. at 87. Accordingly, the district court denied the defendants' motion for summary judgment and granted the plaintiffs' cross-motion for summary judgment. Id.

Defendants challenge the district court's ruling on appeal, arguing that (1) the HBA is a general regulatory scheme applicable to Indian lands and thus the BIA has an obligation to enforce the HBA against Kunz, and (2) the State (via the Utah State Department of Transportation) has authority to enforce the HBA's limitations against Kunz. We review de novo the district court's grant of summary judgment. See Croy v. Cobe Lab., Inc., 345 F.3d 1199, 1201 (10th Cir. 2003). Likewise, we review de novo the district court's interpretation of a federal statute, in this instance the HBA. See Schusterman v. United States, 63 F.3d 986, 989 (10th Cir. 1995).

*a) Overview of the HBA*

The HBA regulates outdoor advertising, including billboards, on or near interstate highways. It begins by declaring Congress' intent regarding the control of outdoor advertising:

The Congress hereby finds and declares that the erection and maintenance of outdoor advertising signs, displays, and devices in areas adjacent to the Interstate System and the primary system should be controlled in order to protect the public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty.

23 U.S.C. § 131(a).

Because the majority of land adjacent to the interstate highway system is non-federal, the HBA creates financial incentives for the States to "ma[k]e provision for effective control of the erection and maintenance along the Interstate System and the primary system of outdoor advertising . . . ." 23 U.S.C. § 131(b). In particular, if a State does not make such provision, the HBA directs that the federal-aid highway funds apportioned to that State "shall be reduced by amounts equal to 10 per centum of the amounts which would otherwise be apportioned to such State . . . until such time as such State shall provide for such effective control." Id.

The HBA outlines, in some detail, how "effective control" of outdoor advertising is to be maintained. 23 U.S.C. § 131(c). Generally speaking, outdoor advertising displays on land "outside of urban areas, visible from the main traveled way of the [interstate highway] system, and erected with the purpose of their message being read from such main traveled way," are strictly limited to "directional and official signs and notices" and must "conform to national standards . . . concerning lighting, size, number, and spacing of signs . . . ." Id. Greater flexibility is allowed for outdoor advertising displays that are erected "within areas adjacent to the interstate and primary systems which are zoned industrial or commercial under authority of State law, or in unzoned commercial or

23

industrial areas as may be determined by agreement between the several States and" the

federal government. 23 U.S.C. § 131(d). As noted by the federal appellees, "[t]he HBA

contemplates that states will achieve compliance with [these] national standards through

zoning, eminent domain, and direct regulation of land use under state law." Fed. Aplee.

Br. at 46. Consistent with this notion, the HBA does not prohibit States from regulating in

the area of outdoor advertising. To the contrary, it permits States to "establish[] standards

imposing stricter limitations with respect to" outdoor advertising displays than are

otherwise established in the HBA. 23 U.S.C. § 131(k).

In addition to these provisions, the HBA contains a separate provision regarding

federal land:

> All public lands or reservations of the United States which are adjacent to
> any portion of the Interstate System and the primary system shall be
> controlled in accordance with the provisions of this section and the national
> standards promulgated by the Secretary.

23 U.S.C. § 131(h). Aside from this provision, no other mention is made in the HBA of

federal land in general, or of land held by the federal government in trust for an Indian

tribe.

### b) Obligation of the BIA to enforce the HBA

Defendants first argue that the HBA, by its express language, applies to the land at

issue and that the BIA "clearly had a responsibility," at least during the process of

approving the trust acquisition and the leases, "to see that the HBA was enforced." Aplt.

Br. at 43. In turn, defendants argue that the billboards erected on the land "cannot meet

24

th[e] standards" of the HBA "unless they are moved." Id.

A review of the record on appeal establishes that defendants did not raise this argument below. In particular, defendants' third-party claim contains no mention of the BIA having an obligation to enforce the HBA. Rather, the defendants' third-party claim speaks simply in terms of Kunz's signs failing to meet the HBA standards and the State having a right to enforce the HBA against Kunz and the Band. See Fed. Aplee. Supp. App. at 23-25, 34. Similarly, there is no indication in the record that the defendants ever sought to amend their third-party claim to assert an obligation on the part of the BIA to enforce the HBA. For example, although the appendix does not include any of the summary judgment pleadings filed by the parties below, the district court's order granting summary judgment in favor of the plaintiffs contains no mention of the argument now asserted by defendants. Thus, we conclude the issue has been waived by defendants. See Cummings v. Norton, 393 F.3d 1186, 1190 (10th Cir. 2005) (noting "the general rule that issues not raised below are waived on appeal.").

*b) Whether the State of Utah has the right to regulate the billboards*

Defendants contend that, even in the absence of federal enforcement, the State of Utah "has the authority to restrict the placement of billboards on the subject property by the non-Indian lessee." Aplt. Br. at 46. More specifically, defendants argue that the State's authority in this regard arises from either (1) the HBA's express delegation of authority to the State to enforce the limitations contained therein, or (2) the State's own police power. Id.

25

*1) Express delegation of authority?*

Defendants assert that the HBA expressly authorizes the State to regulate outdoor advertising displays on the land at issue. As they did below, defendants first cite to 28 U.S.C. § 131(h), which, as noted above, purports to make the HBA applicable to "[a]ll public lands or reservations of the United States which are adjacent to any portion of the Interstate System and the primary system . . . ." We agree with the district court, however, that even assuming § 131(h) makes the HBA applicable to land held in trust by the United States for an Indian tribe, nothing therein can be read as authorizing state enforcement of the HBA on such trust land. Rather, we agree with the district court and the Supreme Court of California that such enforcement would be reserved for the federal government. See People ex rel. Dep't of Transp. v. Naegele Outdoor Adver. Co., 698 P.2d 150, 156 (Cal. 1985) (concluding the HBA contains no clear and unambiguous mandate providing for state enforcement, and further concluding that, had Congress intended for states to enforce the HBA on Indian tribal lands, "it would have empowered the relevant state authorities to condemn reservation lands, to regulate tribal land use, and to sue Indian tribes.").

In a Rule 28(j) letter filed shortly before oral arguments in this case, and again during oral arguments, defendants cited to an additional provision of the HBA, 28 U.S.C. § 131(j), which they assert also expressly authorizes state enforcement of the HBA on trust

land.[6]  In light of the fact that § 131(j) was in existence at the time of the district court proceedings, yet was not cited by defendants until their Rule 28(j) letter, we find it unnecessary to address the meaning of the provision and its possible impact on state enforcement of the HBA on trust land.  See Shawnee Tribe v. United States, 405 F.3d 1121, 1128 n.6 (10th Cir. 2005) ("a 28(j) letter is not the proper mechanism to address a new argument."); United States v. Kimler, 335 F.3d 1132, 1138, n.6 (10th Cir. 2003) ("We will not address issues not raised in the appellant's opening brief, especially where the arguments are based on authority that was readily available at the time of briefing.").

*2) The State's police power*

Defendants alternatively argue that, even absent express authorization from the HBA, the State of Utah can, "acting under its own police power, . . . restrict the unlawful placement of billboards by Kunz."  Aplt. Br. at 46.  In addressing this same argument below, the district court first concluded that the land at issue constituted "Indian country," as defined in 18 U.S.C. § 1151.  App. at 75-78.  Notably, defendants do not challenge this

---

[6] Section 131(r)(2) provides as follows:
**Removal of illegal signs.--**
(1) **By owners.**–Any sign, display, or device along the Interstate System or the Federal-aid primary system which was not lawfully erected, shall be removed by the owner of such sign, display, or device not later than the 90th day following the effective date of this subsection.
(2) **By States.**–If any owner does not remove a sign, display, or device in accordance with paragraph (1), the State within the borders of which the sign, display, or device is located shall remove the sign, display, or device. The owner of the removed sign, display, or device shall be liable to the State for the costs of such removal.  Effective control under this section includes compliance with the first sentence of this paragraph.
23 U.S.C. § 131(r).

conclusion on appeal. Thus, we proceed from the assumption that the land at issue constitutes "Indian country."[7]

A state may exercise its authority over activities of non-tribal members on "Indian country" only "under certain circumstances . . . ." New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 331 (1983). Whether the erection and maintenance of billboards constitutes such a circumstance requires "a particularized inquiry into the nature of the state, federal, and tribal interests at stake." Id. at 333. "State jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." Id. at 334. This "inquiry is to proceed in light of traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its 'overriding goal' of encouraging self-sufficiency and economic development." California v. Cabazon Band of Mission Indians, 480 U.S. 202, 216 (1987)

---

[7] Although the jurisdictional importance of "Indian country" originated in federal criminal statutes and other specific statutory contexts, the Supreme Court now considers "the Indian country classification [to be] the benchmark for approaching the allocation of federal, tribal, and state authority with respect to Indians and Indian lands." Indian Country, U.S.A., Inc. v. Oklahoma Tax Comm'n, 829 F.2d 967, 973 (10th Cir. 1987); cf. Blunk v. Arizona Dept. of Transp., 177 F.3d 879, 883-84 (9th Cir. 1999) (concluding that the Arizona Department of Transportation had authority to regulate billboards on non-reservation fee land because that land did not constitute "Indian country").

As noted, defendants have not challenged on appeal the district court's conclusion that the land at issue qualifies as "Indian country." Even if that issue had been raised, we would likely agree with the district's conclusion, given our decision in Roberts, where we held that a tribal complex owned by United States in trust for an Indian nation was "Indian Country" for purposes of Major Crimes Act, even though it was not formally declared a reservation. 185 F.3d at 1131.

28

(quoting <u>Mescalero</u>, 462 U.S. at 334-35).

The district court concluded, and we agree, that there are significant federal interests at play here. To begin with, the BIA has accepted the subject property into trust on behalf of the Band and expressly approved the leases of the land from the Band to Kunz. Further, the BIA has now conducted two EA's in connection with these transactions and has concluded that the erection and maintenance of the billboards will not have a significant environmental impact. Lastly, as noted by the district court, the BIA has adopted the following general policy regarding the applicability of state and local law to trust land, such as the parcels at issue:

> [N]one of the laws, ordinances, codes, resolutions, rules or other regulations of any State or political subdivision thereof limiting, zoning or otherwise governing, regulating, or controlling the use or development of any real or personal property, including water rights, shall be applicable to any such property leased from or held or used under agreement with and belonging to any Indian or Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States.

25 C.F.R. § 1.4(a).[8]

The Band's interests in the land are even more significant. Although defendants argue that the Band will derive little economic benefit from the parcels and the leases, a review of the record establishes otherwise. Prior to the acquisition and leases of the parcels at issue, the Band had only "three sources of income . . . ." App. at 200. These included (1) "a sand and gravel lease," (2) "a mining lease," and (3) "a grazing lease . . . ."

---

[8] Although there are express exceptions to this policy, none of them are applicable in this case. <u>See</u> 25 C.F.R. § 1.4(b) (outlining exceptions).

29

Id. at 201. Notably, the income from these three sources was not "adequate . . . to properly operate functions of, or provide economic development for, the Band." Id. In early 2003, the sand and gravel lease ceased to be a source of income for the Band. Id. As a result, the Band's income from the leases of the parcels at issue now constitutes its greatest source of revenue. Id. at 201, 221. As noted in the March 2003 EA, the leases of the parcels at issue are "anticipated to have a beneficial effect on social and economic conditions of the Band by providing a long-term revenue resource and by helping to establish economic revenue for future economic development initiatives." Id. at 222. In addition to the revenue stream from the leases, it is uncontroverted that the Band owns the parcels at issue and, at the end of the billboard lease terms, will be free to "use the subject property as they wish." Id. at 83. As the district court noted, the "land in the I-15 corridor is . . . developing rapidly," thus suggesting that "ownership of the subject property will clearly be beneficial to the" Band. Id. Finally, and relatedly, there is some indication in the record that the Band intends to ultimately develop the parcels for housing by Band members, the majority of whom, at the present, are forced to live off-reservation due to lack of housing, resources, and employment opportunities. Id. at 133; see Supp. App. at 4.

In contrast, the State has failed, in our view, to establish that its interests in regulating the land are substantial. It is uncontroverted that, in attempting to comply with the HBA, the State passed its own law, the Utah Outdoor Advertising Act. See Utah Code Ann. § 72-7-501, et seq. Notably, the provisions of that Act are virtually identical to those set forth in the HBA, and thus there appears to be no unique state interest in regulating the

30

billboards. Indeed, the State admits in its opening appellate brief that it is "regulating consistently with federal policy." Aplt. Br. at 49. Although the State suggests that its failure to regulate the billboards might result in the federal government penalizing it under the HBA by withholding federal highway funds, there is simply no evidence in the record suggesting that this is a legitimate threat, particularly given the fact that the federal government has expressly authorized the billboards at issue.

The State also suggests that the area in which the billboards are located has "unique scenic value," and that the billboards have "caused" "visual pollution . . . ." Aplt. Br. at 53. However, the district court found that the area in which the billboards are located "is already significantly developed," thereby undercutting the State's "visual pollution" argument. App. at 85. Importantly, the State has not challenged this finding on appeal.

Lastly, the State complains that if it is precluded from regulating the land at issue, the Band will effectively have been allowed to "market an exemption" from State regulation. Such a result, the State argues, will "encourage[] third parties to take advantage of the protected status of Indians." Aplt. Br. at 51. In support of its argument, the States points to Washington v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134 (1980), in which the Supreme Court upheld state taxes applied to on-reservation retail sales by non-Indians of cigarettes and tobacco products. In reaching this conclusion, the Court stated: "[w]e do not believe that principles of federal Indian law, whether stated in terms of pre-emption, tribal self-government, or otherwise, authorize Indian tribes thus to market an exemption from state taxation to persons who would

31

normally do their business elsewhere." Id. at 155.

Two factors distinguish the instant case from Colville. First, unlike the situation in Colville, the Band in this case has not marketed an exemption from state taxation. "Thus, a central component to the reasoning of Colville is inapplicable here." Prairie Band Potawatomi Nation v. Richards, 379 F.3d 979, 985 (10th Cir. 2004). Second, unlike the tribe in Colville, the record in this case clearly establishes that the Band has a significant economic interest in the land at issue and the billboard advertising that is occurring thereon. Not only are the billboard leases providing the Band with a significant portion of its current revenue, the record on appeal establishes that the land is an important asset for the Band in terms of future economic development.

In sum, balancing the federal, tribal, and State interests against one another leads us to conclude that allowing the State to exercise control over the land at issue would "threaten Congress' overriding objective of encouraging tribal self-government and economic development." Mescalero, 462 U.S. at 341. Thus, we agree with the district court that the State cannot exercise its police power to regulate the land at issue.

The judgment of the district court is AFFIRMED. Appellees' Motion to Strike Appellants' Notice of Supplemental Authority is DENIED.

03-4274, <u>Shivwits Band of Paiute Indians v. Utah</u>

**LUCERO,** Circuit Judge, concurring.


I join in the opinion of my esteemed majority colleagues, but write separately to provide what I consider to be a missing step in the analysis. Without deciding whether the Highway Beautification Act ("HBA") applies to Indian lands, the majority concludes that if the HBA does apply to Indian lands, it is subject to federal, not state, enforcement. The problem with this reasoning is that if the HBA does not apply to Indian lands, any remaining discussion would be unnecessary. Thus, it does not appear that this is an appropriate case upon which to proceed by rhetorical assumption. The parties have directly presented and briefed the question of HBA application to Indian lands, and it is my considered judgment that we must first address that question directly. Only having decided this issue may we properly proceed to the conclusion that the state may not enforce HBA regulations on Indian lands.

We consider the question of whether the HBA applies to Indian lands under the shadow of <u>Federal Power Commission v. Tuscarora</u>, which states that "a general statute in terms applying to all persons includes Indians and their property interests." 362 U.S. 99, 116 (1960). This broad statement was not essential to <u>Tuscarora</u>'s narrow holding, as the statute in question specifically addressed its application on Indian lands. <u>Id.</u> at 112. A subsequent Supreme Court case did not apply <u>Tuscarora</u>. <u>Merrion v. Jicarilla Apache Tribe</u>, 455 U.S. 130 (1982) (holding that a federal statute governing oil and gas leases did not bar a tribe's power to tax and stating that "'a proper respect both for tribal sovereignty

itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent'") (quoting Santa Clara Pueblo v. Martinez, 436 U.S. 49, 60 (1978)).  At least three circuits have interpreted the Court's statements in Merrion to limit the broad Tuscarora principle.  See Donovan v. Navajo Forest Products Industries, 692 F.2d 709, 713 (10th Cir. 1982); Smart v. State Farm Ins. Co., 868 F.2d 929 (7th Cir. 1989); United States v. Farris, 624 F.2d 890, 893-894  (9th Cir. 1980).

Reconciling the Court's varying statements in Merrion, Santa Clara Pueblo, and Tuscarora, this circuit and others have acknowledged three exceptions to Tuscarora's rule that federal statutes of general applicability apply to Indian lands.  These exceptions, pronounced in Nero v. Cherokee Nation of Oklahoma, are applied if  "(1) the law touches 'exclusive rights of self-governance in purely intramural-matters'; (2) the application of the law to the tribe would 'abrogate rights guaranteed by Indian treaties'; or (3) there is proof 'by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations.'"  892 F.2d 1457, 1462-63 (10th Cir. 1989) (refusing to find that civil rights law created a cause of action against a tribe) (quoting Donovan v. Coeur d'Alene Tribal Farm, 751 F.2d 1113, 1116 (9th Cir. 1985)); see also EEOC v. Cherokee Nation, 871 F.2d 937 (10th Cir. 1989) (refusing to apply Age Discrimination in Employment Act because it abrogated specific treaty rights); NLRB v. Pueblo of San Juan, 280 F.3d 1278, 1283-84 (10th Cir. 2000) (refusing to apply section of National Labor Relations Act because doing so would abrogate tribe's right of self-government).

2

None of the three <u>Nero</u> exceptions apply in this case. First, the appellees do not allege that application of the Highway Beautification Act would abrogate the tribe's treaty rights. Second, they do not argue that the HBA touches the tribe's rights of self-governance in purely intramural matters. Third, the history of the statute does not suggest that Congress intended to exclude Indian lands from advertising restrictions.

Because petitioners do not establish any of the <u>Nero</u> exceptions, the <u>Tuscarora</u> general principle of applicability controls and compels the conclusion that the HBA does apply to Indian lands. I note that the Interior Board of Indian Affairs came to the opposite conclusion when addressing this question in 1979. <u>Morongo Band of Mission Indians v. Sacramento Area Office</u>, 7 IBIA 299, 1979 WL 21375 (1979). The Board's conclusion, however, turned on its finding that the term "reservation" in § 131(h) of the HBA is ambiguous, a conclusion I do not find plausible based on the plain language of the act. <u>See</u> <u>United States v. Portneuf-Marsh Valley Irr. Co</u>., 13 Fed. 601, 604 (9th Cir. 1914) (holding "reservations" includes Indian reservations).

Determining that the HBA does apply to Indian lands does not answer the question as to whether enforcement of the statute is a state or federal function. Again, I agree with my colleagues that this is a federal and not a state function but write to amplify the analysis to include consideration of the statute's language.

Section 131(h) of the HBA states that the relevant lands "shall be controlled *in accordance with* the provisions of this section." 23 U.S.C. § 131(h) (emphasis added). The use of the phrase "in accordance with" suggests that the remainder of the section provides the substantive standard to be applied. It does not determine the party intended to

3

enforce those standards. Had Congress stated that such lands should be controlled "by" the provisions of this section, perhaps the statute could be read to suggest delegation to the states to enforce HBA regulations on federal lands. However, the language "in accordance with" leaves the question of enforcement unanswered.

Because § 131(h) does not address the question of enforcement, we are guided by general presumptions regarding the application of regulations on Indian lands. There is a presumption against state jurisdiction on Indian lands. California v. Cabazon Band of Mission Indians, 480 U.S. 202, 215 (1987). Indian tribes "retain 'attributes of sovereignty over both their members and their territory.'" Id. at 207 (quoting United States v. Mazurie, 419 U.S. 554, 557 (1975)). Furthermore, "'tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the states.'" Cabazon, 480 U.S. at 207 (quoting Washington v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 154 (1980)).

Notwithstanding this presumption, states are permitted to enforce regulations when Congress explicitly delegates authority to do so. Cabazon, 480 U.S. at 215. The HBA includes no such delegation. The HBA is enforced through zoning and the power of eminent domain. 23 U.S.C. §131(c), (g), (r). There is no indication that the HBA delegated to the states the right to use these powers on Indian lands. See People ex rel. Dep't of Transp. v. Naegele Outdoor Adver. Co., 698 P.2d 150, 156 (Cal. 1985); Morongo Band of Mission Indians v. Sacramento Area Office, 7 IBIA 299, 1979 WL 21375 (1975). A previous version of the statute, on the other hand, provided for enforcement by the federal agency with jurisdiction over the public lands in question. Section 131(d) of the

4

1958 Highway Act, the precursor to the HBA, dealt directly with the enforcement of outdoor advertising regulations on public lands. That section stated:

> Whenever any portion of the Interstate System is located upon or adjacent to any public lands or reservations of the United States, the Secretary of Commerce may make such arrangements and enter into such agreements with the agency having jurisdiction over such lands or reservations as may be necessary to carry out the national policy set forth in subsection (a).

72 Stats. 885, § 131(d), (1958). When the HBA was passed in 1965, section 131(d) was repealed and replaced by the current § 131(h). The House Report published when the HBA was passed states:

> This section simply extends to all public lands and reservations of the United States which are adjacent to any portion of the Interstate System or the primary system the same controls covering other roads which are subject to this legislation.

> H.R. Rep. No. 89-1084, at 3710-3736 (1965). The California Supreme Court has interpreted this history to suggest that Congress intended the same means of enforcement to apply in the 1965 act as had applied in the 1958 act. Naegele, 698 P.2d at 155. Given the presumption against state enforcement, and the fact that a prior version of the statute provided for enforcement by the agency with jurisdiction over the public lands in question, I conclude that § 131(h) requires enforcement not by the state but by the BIA.

5

On my independent review of the record, I also agree with the majority that the state did not argue below that the BIA had an obligation to enforce the HBA. Had the state presented this argument to the district court, I may well have reached a different conclusion than the one I come to today. Appellants having failed to do so, I agree that affirmance is appropriate.